UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION


UNITED STATES OF AMERICA,              )
                                       )
            V.                         )      5:08-CR-262-1-D
                                       )
FERNANDO MIGUEL NUNEZ,                 )
                                       )
            DEFENDANT.                 )
_____        )


SENTENCING
MAY 19, 2009
BEFORE THE HONORABLE JAMES C. DEVER III
U. S. DISTRICT JUDGE




APPEARANCES:

FOR THE GOVERNMENT:

MR. ETHAN ONTJES
ASST. U.S. ATTORNEY
310 NEW BERN AVE.
RALEIGH, NC


FOR THE DEFENDANT:

MR. RUDOLPH ASHTON
ATTORNEY AT LAW
P.O. BOX 12800
NEW BERN, NC




COURT REPORTER:  DONNA J. TOMAWSKI
STENOTYPE WITH COMPUTER AIDED TRANSCRIPTION

```
 1                    TUESDAY, MAY 19, 2009

 2          THE COURT:  WE'LL NEXT TAKE UP THE SENTENCING OF

 3   MR. NUNEZ.  GOOD MORNING, MR. ASHTON.  ARE YOU READY?

 4          MR. ASHTON:  WE ARE, YOUR HONOR.

 5          THE COURT:  IS THE GOVERNMENT READY?

 6          MR. ONTJES:  YES, YOUR HONOR.  WE ARE.  GOOD

 7   MORNING.

 8          THE COURT:  I'D LIKE TO HAVE MR. NUNEZ SWORN.

 9       (DEFENDANT SWORN.)

10          THE COURT:  MR. NUNEZ, DO YOU UNDERSTAND THAT

11   HAVING BEEN SWORN, YOUR ANSWERS TO MY QUESTIONS ARE

12   SUBJECT TO THE PENALTY OF PERJURY?

13          MR. NUNEZ:  YES, YOUR HONOR.

14          THE COURT:  DO YOU KNOW WHY YOU ARE HERE TODAY?

15          MR. NUNEZ:  YES, YOUR EXCELLENCY.

16          THE COURT:  DO YOU KNOW WHAT WE'RE DOING TODAY?

17          MR. NUNEZ:  YES, YOUR HONOR.

18          THE COURT:  HAVE YOU TAKEN ANY KIND OF MEDICINE

19   OR ANY OTHER SUBSTANCE IN THE LAST 48-HOURS THAT WOULD

20   AFFECT YOUR ABILITY TO HEAR AND UNDERSTAND THESE

21   PROCEEDINGS?

22          MR. NUNEZ:  NO, YOUR HONOR.

23          THE COURT:  MR. ASHTON, DO YOU HAVE ANY REASON

24   TO DOUBT MR. NUNEZ'S COMPETENCE TO GO FORWARD HERE TODAY?

25          MR. ASHTON:  NO, YOUR HONOR.
```

1    **THE COURT:**  MR. ONTJES, DO YOU HAVE ANY REASON

2  TO DOUBT MR. NUNEZ'S COMPETENCE TO GO FORWARD HERE TODAY?

3    **MR. ONTJES:**  NO, YOUR HONOR.

4    **THE COURT:**  BASED UPON THE COURT'S OBSERVATIONS

5  OF MR. NUNEZ, HIS ANSWERS TO MY QUESTIONS, AND THE ANSWERS

6  FROM COUNSEL, THE COURT FINDS MR. NUNEZ IS COMPETENT TO GO

7  FORWARD HERE TODAY.

8    MR. NUNEZ IS HERE TODAY HAVING ENTERED A PLEA OF

9  GUILTY TO POSSESSION WITH INTENT TO DISTRIBUTE IN EXCESS

10  OF A HUNDRED KILOGRAMS OF MARIJUANA, IN VIOLATION OF 21

11  U.S. CODE, SECTION 841(A)(1).  HE ENTERED THAT PLEA IN

12  OCTOBER OF 2008, PURSUANT TO PLEA AGREEMENT.

13    MR. NUNEZ, IN LIGHT OF SOME CASES FROM THE SUPREME

14  COURT OF THE UNITED STATES, INCLUDING THE *BOOKER* CASE, THE

15  *RITA* CASE, THE *GALL* CASE, THE *KIMBROUGH* CASE, AND THE

16  *NELSON* AND *SPEARS* CASES, THE SENTENCING GUIDELINES ARE NO

17  LONGER MANDATORY, THEY ARE ADVISORY.  NEVERTHELESS, IN

18  ACCORDANCE WITH THOSE CASES, A SENTENCING COURT STILL MUST

19  TAKE INTO ACCOUNT THE NOW-ADVISORY GUIDELINES.

20    THE COURT DOES THIS BY INITIALLY CALCULATING AN

21  ADVISORY GUIDELINE RANGE AFTER MAKING FINDINGS OF FACT.

22  THE COURT THEN CONSIDERS ANY MOTION THAT EITHER SIDE MIGHT

23  MAKE THAT MIGHT MOVE THAT RANGE EITHER UP OR DOWN.  THE

24  COURT THEN WILL CONSIDER ALL ARGUMENTS THAT YOUR LAWYER,

25  MR. ASHTON, WILL MAKE ON YOUR BEHALF, ANY STATEMENT THAT

1    YOU WOULD LIKE TO MAKE, AND ALL ARGUMENTS OF MR. ONTJES ON

2    BEHALF OF THE GOVERNMENT.  AFTER HEARING FROM ALL OF THOSE

3    FOLKS, THE COURT WILL ANNOUNCE YOUR SENTENCE RIGHT HERE IN

4    COURT TODAY.  THAT WILL BE THE PROCESS THAT WE'LL FOLLOW,

5    AND THAT'S THE PROCESS DESCRIBED IN THE CASES I MENTIONED,

6    AS WELL AS IN RECENT CASES FROM THE 4TH CIRCUIT, INCLUDING

7    THE *EVANS* CASE AND *PAULEY* CASE.

8         MR. ASHTON, DID YOU GET A COPY OF THE PRESENTENCE

9    REPORT?

10              **MR. ASHTON:**  YES, YOUR HONOR.

11              **THE COURT:**  MR. NUNEZ, DID YOU GET A COPY OF

12   THAT REPORT, SIR?

13              **MR. NUNEZ:**  YES, YOUR EXCELLENCY.

14              **THE COURT:**  DID YOU SPEAK WITH YOUR LAWYER ABOUT

15   IT?

16              **MR. NUNEZ:**  YES, YOUR EXCELLENCY.

17              **THE COURT:**  AT THIS TIME THE COURT DIRECTS THAT

18   THE PRESENTENCE REPORT BE PLACED IN THE RECORD UNDER SEAL.

19   IN ACCORDANCE WITH THE FEDERAL RULES OF CRIMINAL

20   PROCEDURE, THE COURT ACCEPTS AS ACCURATE THE PRESENTENCE

21   REPORT, EXCEPT AS TO MATTERS IN DISPUTE, AS NOTED IN THE

22   ADDENDUM.  THE COURT HAS REVIEWED THE ADDENDUM AND IT DOES

23   CONTAIN CERTAIN OBJECTIONS.

24         MR. NUNEZ, YOU MAY HAVE A SEAT.  I'M GOING TO TAKE

25   THESE OBJECTIONS UP WITH MR. ASHTON AT THIS TIME.

1     DO YOU WISH TO BE HEARD, MR. ASHTON, ON THESE
2  OBJECTIONS?
3          **MR. ASHTON:**  SOME BUT NOT ALL, YOUR HONOR.
4          **THE COURT:**  LET'S GO THROUGH THEM IN ORDER AND
5  YOU TELL ME IF YOU EITHER WITHDRAW OR WANT TO BE HEARD ON
6  IT.
7          **MR. ASHTON:**  ON THE FIRST, THE AMOUNT OF DRUGS,
8  WE WOULD WITHDRAW THAT.  I'M NOT PURSUING THAT.  HE'S
9  ACTUALLY HAD SEVERAL DEBRIEFINGS SINCE THAT TIME.
10          **THE COURT:**  SO THAT OBJECTION IS WITHDRAWN.  IS
11  THAT CORRECT, MR. NUNEZ?
12          **MR. NUNEZ:**  YES, YOUR HONOR.
13          **THE COURT:**  THE NEXT OBJECTION IS TO PARAGRAPH
14  11.
15          **MR. ASHTON:**  YEAH.  WE WOULD WITHDRAW THAT AS
16  WELL.  THAT HAS TO DO WITH GETTING THREE POINTS INSTEAD OF
17  TWO FOR THAT ONE CONVICTION.
18          **THE COURT:**  RIGHT.
19          **MR. ASHTON:**  IT'S REAL CLOSE, BUT I RATHER JUST
20  ADDRESS THAT MAYBE AS A DEPARTURE ISSUE.
21          **THE COURT:**  OKAY.  AND YOU AGREE WITH THAT
22  WITHDRAWAL, MR. NUNEZ?
23          **MR. NUNEZ:**  YES, SIR, YOUR HONOR.
24          **THE COURT:**  OKAY.  THE NEXT OBJECTION IS THE
25  OBSTRUCTION OBJECTION AND THE ACCEPTANCE THAT KIND OF GO,

1   IN MANY WAYS, HAND-IN-HAND.  DO YOU WANT TO BE HEARD ON

2   THOSE?

3          **MR. ASHTON:**  YES, YOUR HONOR.  THOSE ARE THE TWO

4   THAT WE WOULD BE PROCEEDING WITH.

5          **THE COURT:**  OKAY.  ALL RIGHT.  I HAVE READ THE

6   REPORT AND I'VE READ THE OBJECTIONS AND THE RESPONSES AND

7   I'M FAMILIAR WITH THE LAW IN THIS AREA, BUT I'LL HEAR FROM

8   YOU, MR. ASHTON, IF YOU WANT TO ADD ANYTHING BEYOND WHAT'S

9   IN THE OBJECTIONS AND WHAT'S IN THE REPORT.

10         **MR. ASHTON:**  YOUR HONOR, THE OBSTRUCTION OF

11   JUSTICE IS AS A RESULT OF SOMEONE IN THE WAKE COUNTY JAIL

12   NAMED LEWIS ALLEN CONTENDING THAT MR. NUNEZ CONTACTED HIM

13   ABOUT THREATENING SOME OF THE CO-DEFENDANTS.

14         **THE COURT:**  NOT JUST THREATENING THEM BUT

15   KILLING THEM, RIGHT?

16         **MR. ASHTON:**  WELL, THAT WOULD BE --

17         **THE COURT:**  I GUESS IT WOULD BE SUBSUMED.  IT

18   WOULD BE A SUBSET, BUT THE THREAT WAS TO MURDER THEM,

19   RIGHT?

20         **MR. ASHTON:**  CORRECT.

21         **THE COURT:**  DOESN'T THE REPORT INDICATE THAT THE

22   DEFENDANT ADMITTED THAT WHEN AGENTS INTERVIEWED HIM?

23         **MR. ASHTON:**  HE ADMITTED DISCUSSING THIS, BUT I

24   DON'T KNOW THAT THIS WAS ACTUALLY MORE THAN JAILHOUSE

25   BRAVADOS.  THE THREE PEOPLE WERE NOT WITNESSES, THEY WERE

1    CO-DEFENDANTS. THEY ALL PLED GUILTY. HE WASN'T GOING TO

2    TRIAL, THEY WEREN'T COMING IN TO TESTIFY. SO I DON'T KNOW

3    THAT THERE'S -- IT WAS MORE OF A HOLLOW THREAT, IF IT WAS

4    A THREAT AT ALL. IT WAS MADE TO A THIRD PARTY, AND I

5    DON'T BELIEVE IT EVER GOT TO THE THREE INDIVIDUALS. WE

6    THINK THAT'S A FACTOR THAT NEEDS TO BE CONSIDERED AS WELL.

7         IT'S MY UNDERSTANDING THAT MR. ALLEN BASICALLY TOOK

8    THIS INFORMATION TO HIS LAWYER SO THAT MAYBE HE COULD GET

9    SOME CONSIDERATION WHEN HE CAME UP FOR SENTENCING. I MEAN

10   HE WAS LOOKING AT BANK ROBBERY WITH BRANDISHING A FIREARM,

11   SO I DON'T SEE HOW MR. ALLEN COULD DO MUCH OF ANYTHING FOR

12   TEN TO 15 YEARS. I BELIEVE HE ACTUALLY GOT A SENTENCE OF

13   168-MONTHS.

14        **THE COURT:** I GUESS IT DEPENDS ON WHERE FOLKS

15   ARE HOUSED, RIGHT?

16        **MR. ASHTON:** WHAT?

17        **THE COURT:** IT DEPENDS ON WHERE YOU ARE HOUSED,

18   DOESN'T IT? LET'S SAY THE CO-DEFENDANTS ARE HOUSED IN THE

19   SAME FACILITY. IT DOESN'T REALLY MATTER IF SOMEBODY IS

20   ABOUT TO GET KILLED IF THEY KNOW THEY ARE ABOUT TO GET

21   KILLED. I GUESS IT AMOUNTS TO WHETHER THE PERSON BEING

22   HIRED TO DO THE KILLING MAYBE KNOWS, AND IF HE KNOWS AND

23   HE'S IN THE SAME BUILDING WITH THE PERSON TO BE KILLED,

24   THAT WOULD SEEM TO BE KIND OF IMPORTANT, DON'T YOU THINK?

25        **MR. ASHTON:** WELL, I DON'T THINK IN THIS

1  PARTICULAR CASE THERE WAS ANY WAY THAT MR. NUNEZ COULD

2  CARRY FORTH -- THAT MR. ALLEN COULD CARRY FORTH WHAT HE

3  WAS SAYING HE WAS ASKED TO DO, OR THAT MR. NUNEZ COULD

4  HAVE PAID HIM OR DONE ANYTHING IN THAT REGARD AS WELL.

5          **THE COURT:**  WHY DO YOU SAY THAT?

6          **MR. ASHTON:**  BECAUSE MR. ALLEN IS LOCKED UP.

7          **THE COURT:**  ALL RIGHT.  BUT WHERE WERE THE

8  PEOPLE THAT WERE BEING HIRED TO BE MURDERED LOCKED UP, DO

9  YOU KNOW?

10         **MR. ASHTON:**  I ASSUME DIFFERENT JAILS AND THEN

11 OFF TO PRISON.  I THINK THEY HAVE ALL BEEN SENTENCED.  I

12 BELIEVE MR. ROBBINS STAYED IN STATE COURT AND TOOK HIS

13 TIME AND IS PROBABLY IN THE DOC SOMEWHERE, OR HE MAY BE

14 OUT BY NOW.  I DON'T KNOW.

15         **THE COURT:**  OKAY.

16         **MR. ASHTON:**  IT WAS DONE ON HIS BEHALF.

17         **THE COURT:**  I UNDERSTAND.  I'M JUST TRYING TO

18 FOLLOW THE LOGIC OF THE ARGUMENT, THAT'S ALL.

19         **MR. ASHTON:**  I CAME LATE IN THE CASE AFTER HE

20 HAD THE FIRST SET OF DEBRIEFINGS, AND IT'S VERY

21 FRUSTRATING THAT THIS WOULD ARISE.

22         **THE COURT:**  OKAY.  MR. ONTJES, DO YOU WANT TO

23 SAY ANYTHING IN RESPONSE?

24         **MR. ONTJES:**  YES, YOUR HONOR.  YOUR HONOR, THE

25 GOVERNMENT IS PREPARED TO CALL AGENT KYLE YORK, WHO IS THE

1  CASE AGENT IN THIS MATTER.  IF I COULD PROFFER BRIEFLY,

2  AGENT YORK WILL TESTIFY THAT HE CAME INTO POSSESSION A

3  LETTER, HANDWRITTEN, I WOULD SUBMIT, BY THE DEFENDANT THAT

4  WAS GIVE TO LEWIS ALLEN, A CELL MATE OVER AT WAKE COUNTY

5  JAIL.  MR. ALLEN, AS THE COURT IS WELL AWARE OF, IS A

6  DEFENDANT WHO WAS SENTENCED BY YOUR HONOR NOT MORE THAN

7  TWO WEEKS AGO FOR ARMED BANK ROBBERY AND 924(C).

8      AGENT YORK RECEIVED THIS LETTER FROM MR. ALLEN'S

9  ATTORNEY.  IN THE LETTER, YOUR HONOR, IF I MAY APPROACH

10  AND INTRODUCE THIS AS GOVERNMENT'S EXHIBIT NO. 1.

11          **THE COURT:**  YES.

12          **MR. ONTJES:**  AS THE COURT WILL SEE, THE LETTER

13  IS VERY DETAILED IN THE INFORMATION PROVIDED REGARDING THE

14  CO-CONSPIRATORS OF THIS DEFENDANT.  BEGINNING WITH

15  MR. DAVID MICHAEL JONES, WHO I WOULD SUBMIT IS SORT OF THE

16  LEADER OF THIS OPERATION, AND THE TWO TRUCKING AGENCIES IN

17  WHICH HE WAS RESPONSIBLE FOR OPERATING WHICH TRANSPORTED

18  THE COCAINE.  THE $30,000 AT THE TOP OF THE LETTER

19  INDICATES THE BOUNTY THAT WAS PLACED ON MR. JONES' HEAD BY

20  THE DEFENDANT.

21      THE NEXT INDIVIDUAL IS MR. JIMMY BROGDEN, JUNIOR.

22  YOUR HONOR, I WOULD SAY THIS IS NOT SOME MERE TALK,

23  BRAVADO, AS DEFENSE COUNSEL CHARACTERIZED IT.  RATHER,

24  THIS IS SPECIFIC, DETAILED INFORMATION OF WHERE THEY LIVE,

25  SOCIAL SECURITY NUMBERS, TELEPHONE NUMBERS, BIRTH DATES,

1    AND PHOTOGRAPH OF THE TARGETS, THE INDIVIDUALS IN WHICH

2    THIS DEFENDANT WANTED KILLED.  NEXT TO MR. BROGDEN'S

3    PICTURES YOU WILL SEE:  REWARD, $20,000, FOR HIS HEAD.

4        THE NEXT DEFENDANT THIS COURT IS VERY WELL FAMILIAR

5    WITH BECAUSE MR. MORGAN WAS BEFORE THIS COURT SOME SIX,

6    EIGHT MONTHS AGO, IF THE COURT RECALLS.

7            **THE COURT:**  I REMEMBER.

8            **MR. ONTJES:**  HE'S THE CO-DEFENDANT OF MR. NUNEZ,

9    WHO WAS INVOLVED IN THE TRAFFIC STOP RESULTING IN THE

10   SEIZURE OF THE 900 POUNDS OF MARIJUANA, WHICH IS WHY THE

11   DEFENDANT IS HERE BEFORE THIS COURT TODAY.

12       MR. MORGAN, AGAIN THE INFORMATION IS VERY, VERY

13   DETAILED, SPECIFIC, ACCURATE INFORMATION OF WHERE HE

14   LIVES, SOCIAL SECURITY, DATE OF BIRTH, PHONE NUMBER,

15   PHOTOGRAPH, AND AGAIN A DOLLAR AMOUNT, MEXICAN CARTEL

16   REWARD, $20,000.

17       SO, JUDGE DEVER, I WOULD SUBMIT -- AGAIN, THE CASE

18   AGENT IS PREPARED TO TESTIFY THAT HE RECEIVED THIS LETTER,

19   HE THEN WENT AND INTERVIEWED MR. ALLEN, WHO CORROBORATED

20   OR -- NOT CORROBORATED, BUT RATHER DESCRIBED HOW HE CAME

21   INTO POSSESSION OF THIS LETTER.  THAT MR. NUNEZ APPROACHED

22   HIM WHILE BEING HOUSED TOGETHER AT THE WAKE COUNTY JAIL.

23   THAT MR. NUNEZ NOT ONLY SOLICITED MR. ALLEN TO COMMIT

24   THESE ACTS BUT ALSO, I WOULD SUBMIT, TRIED TO RECRUIT

25   MR. ALLEN INTO THE DRUG BUSINESS.  THESE CONVERSATION WERE

1  ALL GOING ON WHILE THIS DEFENDANT, MR. NUNEZ, WAS AWAITING

2  SENTENCING BEFORE YOUR HONOR.

3      AFTER SPEAKING WITH MR. ALLEN, AGENT YORK THEN WENT

4  AND CONFRONTED THE DEFENDANT MR. NUNEZ, WITH HIS ATTORNEY.

5  DURING THAT INTERVIEW, YOUR HONOR, THE DEFENDANT ADMITTED,

6  YES, I DID IN FACT SPEAK TO MR. ALLEN ABOUT KILLING THESE

7  THREE INDIVIDUALS.  I WOULD SUBMIT THE REASON BEING,

8  SPECIFICALLY MR. JONES PROVIDED HISTORICAL DRUG WEIGHT

9  THAT WAS INCREASING THIS DEFENDANT'S SENTENCE GUIDELINE.

10 THAT'S WHY HE WANTED HIM KILLED.

11     NOW THERE ARE OTHER REASONS, YOU KNOW, MONEY OWED FOR

12 DRUG DEBTS, SO FORTH, BUT I SUBMIT TO YOUR HONOR THAT

13 THESE INDIVIDUALS, IN THE EYES OF THE DEFENDANT, WERE

14 GOING TO DRAMATICALLY INCREASE HIS SENTENCING GUIDELINE

15 RANGE AND IF HE COULD ELIMINATE THEM, THEN THE RANGE WOULD

16 COME DOWN.  THAT WOULD BE THE GOVERNMENT'S THEORY AS TO

17 MOTIVE WHY THIS DEFENDANT, NOT ON THE FACT THAT HE WAS

18 GOING TO TRIAL OR THAT THESE INDIVIDUALS WERE READY TO

19 TESTIFY AGAINST HIM IN ANY TYPE OF PROCEEDING LIKE THAT.

20 THAT, I SUBMIT, IS THE REASON.

21     AS THE COURT HAS ALREADY INDICATED, I THINK ONCE THE

22 DEFENDANT ACKNOWLEDGED SOLICITING MR. ALLEN TO COMMIT

23 THESE ACTS, I WOULD SUBMIT THAT'S ALL THAT'S REQUIRED

24 UNDER THE OBSTRUCTION ENHANCEMENT HERE.  THE LEGAL

25 POSSIBILITY OR IMPOSSIBILITY, AS DEFENSE COUNSEL WOULD

1   MAKE, I WOULD SUBMIT IS NOT RELEVANT HERE.

2       THE COURT HAS ALREADY, I THINK, POINTED OUT MR. ALLEN

3   COULD HAVE BEEN PLACED WITH MR. JONES IN A FEDERAL

4   FACILITY, OR WITH MR. MORGAN.  MR. ALLEN COULD HAVE

5   SOLICITED OTHER INDIVIDUALS IN OTHER PRISONS TO CARRY OUT

6   THE WORK AT THE REQUEST OF MR. NUNEZ FOR THE PAYMENTS AS

7   OUTLINED IN THIS LETTER.

8       SO, YOUR HONOR, I THINK BY A PREPONDERANCE OF THE

9   EVIDENCE THE GOVERNMENT HAS ESTABLISHED, AND AGAIN, I'M

10  PROFFERING WHAT THIS AGENT WOULD TESTIFY TO THE COURT.

11      IN ADDITION, I WOULD MAKE THE COURT AWARE THAT

12  MR. ALLEN IS ALSO HERE TODAY, IF THE COURT WOULD LIKE TO

13  HEAR FROM HIM AS WELL OF THE THREAT AND HOW IT CAME ABOUT.

14          **THE COURT:**  MR. ASHTON, DO YOU WANT TO HEAR FROM

15  THESE WITNESSES; DO YOU WANT TO CROSS-EXAMINE THEM?

16          **MR. ASHTON:**  I'M PREPARED TO CROSS-EXAMINE

17  MR. ALLEN.

18          **THE COURT:**  I'LL LET YOU CALL YOUR WITNESSES,

19  MR. ONTJES.

20          **MR. ONTJES:**  I WOULD FIRST CALL AGENT YORK.

21  **KYLE YORK**, BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS

22  DURING **DIRECT EXAMINATION**:

23          **THE COURT:**  THE COURT HAS RECEIVED GOVERNMENT'S

24  EXHIBIT NO. 1.

25      AGENT, MR. ONTJES IS GOING TO HAVE SOME QUESTIONS FOR

1  YOU, THEN MR. ASHTON WILL HAVE QUESTIONS FOR YOU.  IF ONE

2  OF THE LAWYERS OBJECTS TO A QUESTION, JUST DON'T ANSWER

3  UNTIL I RULED.  WHEN THAT, MR. ONTJES, YOU MAY EXAMINE THE

4  WITNESS.

5  **BY MR. ONTJES:**

6  **Q.**   GOOD MORNING, AGENT YORK.

7  **A.**   GOOD MORNING.

8  **Q.**   HOW ARE YOU EMPLOYED?

9  **A.**   I'M A TASK FORCE AGENT WITH THE UNITED STATES DRUG

10  ENFORCEMENT ADMINISTRATION, EMPLOYED BY THE CITY OF

11  DURHAM, NORTH CAROLINA, AND HAVE BEEN IN THAT CAPACITY

12  SINCE ABOUT 2002.

13  **Q.**   ALL RIGHT.  AND AS A DEA TASK FORCE OFFICER, ARE YOU

14  FAMILIAR WITH THE INVESTIGATION AND OPERATIONS OF THE

15  DEFENDANT, MR. NUNEZ?

16  **A.**   I AM.

17  **Q.**   AND IN ADDITION, AGENT YORK, I BELIEVE YOU WERE ALSO

18  THE CASE AGENT INVOLVED IN THE CASE OF MR. DAVID MICHAEL

19  JONES?

20  **A.**   THAT'S CORRECT.

21  **Q.**   AND HIS OPERATIONS?

22  **A.**   YES, SIR.

23  **Q.**   FIRST, HOW LONG HAVE YOU BEEN INVESTIGATING OR

24  WORKING ON THE JONES ORGANIZATION, I'LL CALL IT?

25  **A.**   SINCE ABOUT 2002 IS THE FIRST CASE I DEALT WITH AS A

1   TASK FORCE AGENT WITH THE UNITED STATES DRUG ENFORCEMENT

2   ADMINISTRATION HERE IN RALEIGH.

3   **Q.**   CAN YOU BRIEFLY DESCRIBE FOR THE COURT THE JONES

4   ORGANIZATION AND HOW THIS DEFENDANT FIT INTO THAT

5   ORGANIZATION BASED ON YOUR INVESTIGATION OVER WHAT FIVE,

6   SEVEN YEARS?

7   **A.**   YES, SIR.  MR. JONES WAS THE OWNER/OPERATOR OF A

8   TRACTOR TRAILER COMPANY HERE IN NORTH CAROLINA,

9   SPECIFICALLY IN THE CREEDMOOR/OXFORD AREA.  MR. JONES WAS

10  A TRANSPORTATION ARM FOR A MEXICAN CARTEL AND INDIVIDUALS

11  THAT ARE ON THE U. S. SIDE OF THE BORDER WHERE, IN PART,

12  HE WOULD TRANSPORT IN EXCESS OF HUNDREDS OF THOUSANDS OF

13  POUNDS OF MARIJUANA FROM MEXICO INTO LAREDO, TEXAS, THEN

14  TO POINTS ELSEWHERE WITHIN THE UNITED STATES.

15       IN ADDITION TO THE MARIJUANA, HE ALSO TRANSPORTED

16  LARGE AMOUNTS OF COCAINE, IN EXCESS OF THOUSANDS OF KILOS

17  OF COCAINE.  THIS OCCURRED FROM 1996 THROUGH HIS ARREST.

18       MR. NUNEZ FELL INTO THIS ORGANIZATION AS A PERSON WHO

19  HAD CONTACT WITH ANOTHER -- WELL, A POTENTIAL CO-DEFENDANT

20  WHO RESIDES IN CALIFORNIA.  MR. NUNEZ, ACCORDING TO

21  MR. JONES, FACILITATED ORCHESTRATING THE LOADS FROM LAREDO

22  INTO NORTH CAROLINA AND THEN FROM NORTH CAROLINA TO POINTS

23  ELSEWHERE.

24  **Q.**   AGENT YORK, MR. JONES HAS BEEN SENTENCED; IS THAT

25  RIGHT?

1   **A.**   YES, SIR.

2   **Q.**   I BELIEVE HE'S SENTENCED TO A LIFE SENTENCE BY JUDGE

3   FOX?

4   **A.**   THAT'S CORRECT.

5   **Q.**   WHEN DID YOU BECOME AWARE OF MR. NUNEZ AND HIS ROLE

6   IN THIS INVESTIGATION?

7   **A.**   DURING THE POINT AT WHICH HIS OTHER CO-DEFENDANTS,

8   PHILLIP MORGAN, JIMMY BROGDEN, AND MR. NUNEZ WERE FIRST

9   ARRESTED IN CREEDMOOR, NORTH CAROLINA, FOR APPROXIMATELY

10   900 POUNDS OF MARIJUANA, I DON'T REMEMBER THE EXACT DATE,

11   IS THE FIRST TIME THAT I BECAME FAMILIAR WITH MR. NUNEZ.

12   **Q.**   SO SUBSEQUENT INVESTIGATION YOU WERE ABLE TO

13   DETERMINE THAT MR. NUNEZ HAD THIS RELATIONSHIP BETWEEN THE

14   DEFENDANT AND MR. JONES AND HIS ORGANIZATION?

15   **A.**   CORRECT.  AT THAT ARREST IN CREEDMOOR, NORTH

16   CAROLINA, WITH MR. MORGAN, MR. BROGDEN, AND MR. NUNEZ,

17   MR. MORGAN AND BROGDEN DID PROVIDE A FULL STATEMENT WHICH

18   IMPLICATED MR. NUNEZ IN HIS PARTICIPATION WITHIN THE

19   ORGANIZATION.

20   **Q.**   MR. NUNEZ DID NOT PROVIDE A STATEMENT INITIALLY?

21   **A.**   THAT'S CORRECT.

22   **Q.**   IF I COULD FAST-FORWARD WITH YOU, AGENT YORK.  THE

23   DEFENDANT NOW ENTERED HIS PLEA TO POSSESSION TO DISTRIBUTE

24   A HUNDRED KILOS OF MARIJUANA.  YOU THEN WERE CONTACTED

25   ABOUT A LETTER, I BELIEVE, WHICH HAD BEEN PREVIOUSLY

1    INTRODUCED AS GOVERNMENT'S EXHIBIT NO. 1.

2         **MR. ONTJES:**  YOUR HONOR, IF I MAY BORROW THAT

3    FROM YOU?

4         **THE COURT:**  YES.

5    **BY MR. ONTJES:**

6    **Q.**   AGENT YORK, I'M GOING TO SHOW YOU WHAT'S BEEN

7    PREVIOUSLY INTRODUCED AS GOVERNMENT'S EXHIBIT 1.  CAN YOU

8    PLEASE IDENTIFY THAT FOR THE COURT?

9    **A.**   THIS IS THE LETTER THAT I RECEIVED VIA TELEPHONE CALL

10   FROM UNITED STATES ATTORNEY'S OFFICE AND LEWIS ALLEN'S

11   ATTORNEY, SLADE TRABUCCO.  IT'S ACTUALLY A PHOTOCOPY OF

12   THE LETTER.

13   **Q.**   ONCE YOU RECEIVED THIS LETTER, AGENT YORK, DID YOU

14   HAVE A CHANCE TO REVIEW IT AND LOOK AT IT?

15   **A.**   I DID.  I WAS VERY FAMILIAR WITH EACH OF THE

16   INDIVIDUALS LISTED ON THE LETTER.

17   **Q.**   WHO ARE THESE INDIVIDUALS?

18   **A.**   THEY ARE CO-DEFENDANTS, DAVID MICHAEL JONES WHICH,

19   FOR LACK OF A BETTER TERM, IS THE RING LEADER OF THE

20   ORGANIZATION HERE IN NORTH CAROLINA.  JIMMY WAYNE BROGDEN,

21   JUNIOR, WHICH IS ANOTHER CO-DEFENDANT OF MR. NUNEZ.

22   PHILLIP MORGAN, WHO'S A CO-DEFENDANT, ALSO A PART OF THE

23   JONES ORGANIZATION.

24   **Q.**   AND AS PREVIOUSLY DESCRIBED, I THINK THE COURT HAS

25   HAD A CHANCE TO SEE THE INFORMATION PROVIDED IN THIS

1  LETTER, AS FAR AS THE ADDRESS, THE PHONE NUMBERS, THE

2  SOCIAL SECURITY, DATE OF BIRTH.  TO THE BEST OF YOUR

3  KNOWLEDGE, IS THAT ACCURATE INFORMATION?

4  **A.**   YES, SIR, IT IS.

5  **Q.**   AGENT, DO YOU HAVE ANY, BASED ON YOUR TRAINING AND

6  EXPERIENCE, ANY IDEA HOW THIS INFORMATION WAS OBTAINED?

7  **A.**   I'M FAIRLY CERTAIN THAT THE INFORMATION SPECIFIED, AS

8  FAR AS THE PHONE NUMBER, THE ADDRESS, SOCIAL SECURITY

9  NUMBER, DATE OF BIRTH, AND SPECIFICALLY THE TWO PHOTOS

10  CONTAINED WITHIN THE LETTER SPECIFICALLY CAME FROM THE

11  STATE ARREST WARRANTS.  THOSE TWO PHOTOS THAT ARE TAPED OR

12  PASTED TO THE ORIGINAL ARE EXACTLY WHERE THE INFORMATION

13  WOULD HAVE COME FROM.  THERE'S TWO SMALL BLACK AND WHITE

14  PHOTOS ON THE TOP OF THE STATE ARREST WARRANT, RIGHT HAND

15  CORNER.

16  **Q.**   WOULD THE DEFENDANT HAVE BEEN PROVIDED THESE STATE

17  ARREST WARRANTS UPON HIS ARREST IN THE NORMAL DISCOVERY

18  PROCESS OF THE STATE?

19  **A.**   THAT'S CORRECT.

20  **Q.**   ONCE YOU RECEIVED THIS LETTER, AGENT YORK, WHAT DID

21  YOU DO WITH IT?

22  **A.**   I AGAIN -- FIRST THING WAS I VERIFIED WHO THESE

23  PEOPLE WERE.  SECOND OF ALL, I HAD A DISCUSSION ABOUT THE

24  LETTER.  I CONTACTED MR. TRABUCCO TO SET UP AN INTERVIEW

25  WITH HIS CLIENT, MR. ALLEN.

1  **Q.**  DID YOU IN FACT INTERVIEW MR. ALLEN?

2  **A.**  I DID.

3  **Q.**  I BELIEVE YOU DISCUSSED HOW HE RECEIVED THIS LETTER?

4  **A.**  I DID.  WE HAD A LENGTHY DISCUSSION.  MR. ALLEN, WHO

5  WAS HOUSED WITH MR. NUNEZ IN THE WAKE COUNTY JAIL IN TWO

6  DIFFERENT PODS, THEY STRUCK A RELATIONSHIP BASED ON

7  MR. ALLEN'S MIXED MARSHAL ARTS, FIGHTING, AND THE FACT

8  THAT MR. ALLEN SPEAKS SPANISH.  HE FELT THAT THAT HELPED

9  WITH THEIR RELATIONSHIP AND TO KIND OF FOSTER THE

10  RELATIONSHIP.

11  　　MR. ALLEN -- INITIALLY THEY DISCUSSED WHY THEY WERE

12  IN JAIL TOGETHER.  MR. NUNEZ SAID THAT HE WAS IN JAIL FOR

13  HIS ARREST IN CREEDMOOR AND MR. ALLEN TOLD MR. NUNEZ THAT

14  HE WAS IN JAIL FOR A FRAUD CASE.

15  **Q.**  DID MR. ALLEN INDICATE WHEN HE WOULD BE GETTING OUT

16  OF JAIL?

17  **A.**  HE DID SAY -- MAKE AN EFFORT TO SAY THAT HE WAS

18  GETTING OUT SOON.

19  **Q.**  OKAY.  SO HE TRIED TO MAKE A STORY THEN?

20  **A.**  YES.

21  **Q.**  AND THEN DID HE TELL YOU HOW HE CAME ABOUT POSSESSING

22  THIS LETTER?

23  **A.**  HE DID.  HE SAID THAT DURING THEIR RELATIONSHIP AND

24  THE CONFIDENCE GAME BETWEEN EACH OTHER DISCUSSING THEIR

25  ARREST, HE SAID THAT -- MR. ALLEN STATED THAT MR. NUNEZ

1   BASICALLY SOLICITED HIM INTO THE BUSINESS OF THE DRUG

2   TRADE THAT MR. NUNEZ WAS INVOLVED WITH.  AND ALSO MR.

3   NUNEZ HAD SOLICITED MR. ALLEN TO KILL MR. JONES,

4   MR. BROGDEN, AND PHILLIP MORGAN BASED ON THIS LETTER ALSO.

5   **Q.**   IN FACT, I THINK IT LAID OUT HOW MUCH HE WOULD PAY

6   FOR EACH INDIVIDUAL KILLING?

7   **A.**   ON THE LETTER, YES.  SPECIFICALLY 30,000 FOR

8   MR. JONES AND 20,000 FOR EACH OF MR. BROGDEN AND

9   MR. MORGAN.

10  **Q.**   NOW, MR. ALLEN, OF COURSE, TURNED THIS INFORMATION

11  OVER TO HIS ATTORNEY, WHICH YOU OBVIOUSLY RECEIVED?

12  **A.**   HE DID.

13  **Q.**   AFTER SPEAKING TO MR. ALLEN, WHAT DID YOU DO NEXT

14  WITH THIS LETTER, AGENT YORK?

15  **A.**   I THEN CONTACTED MR. NUNEZ'S ATTORNEY AND SET UP A

16  DEBRIEFING WITH MR. NUNEZ.

17  **Q.**   OKAY.  AND DURING THAT DEBRIEFING, AGENT YORK, DID

18  YOU IN FACT CONFRONT THE DEFENDANT WITH THIS LETTER,

19  GOVERNMENT'S EXHIBIT NO. 1?

20  **A.**   I DID CONFRONT MR. NUNEZ.  MR. NUNEZ INITIALLY DENIED

21  ANY KNOWLEDGE OR PARTICIPATION WITHIN THE DRUG

22  ORGANIZATION.  I THEN PRESENTED THE LETTER TO HIM,

23  EXPLAINED THE SITUATION THAT HE WAS EXPOSING HIMSELF TO,

24  AND HE DID ADMIT THAT HE DID SOLICIT MR. ALLEN TO KILL

25  THESE INDIVIDUALS AND THAT HE ALSO HAD A SIGNIFICANT ROLE

1   WITHIN THE DRUG TRAFFICKING ORGANIZATION.

2          **MR. ONTJES:**  YOUR HONOR, I BELIEVE THAT'S ALL

3   THE QUESTIONS I HAVE FOR AGENT YORK.

4          **THE COURT:**  CROSS-EXAMINATION.

5                    **CROSS-EXAMINATION**

6   **BY MR. ASHTON:**

7   **Q.**   AGENT YORK, WE HAD AN INITIAL DEBRIEFING, MY CLIENT

8   WITH YOU AND ANOTHER AGENT BACK ON JANUARY 30, I BELIEVE;

9   IS THAT CORRECT?

10  **A.**   I BELIEVE THAT WAS THE CORRECT DATE.

11         **THE COURT:**  OF 2009?

12         **MR. ASHTON:**  2009.

13         **THE COURT:**  OKAY.

14  **BY MR. ASHTON:**

15  **Q.**   AT THE WAKE COUNTY JAIL, CORRECT?

16  **A.**   YES, SIR.

17  **Q.**   AND AT THE CONCLUSION OF THAT DEBRIEFING, IT WAS MY

18  UNDERSTANDING, AND CORRECT ME IF I'M WRONG, THAT MR. NUNEZ

19  HAD PROVIDED SOME INFORMATION BUT YOU THOUGHT HE HAD MORE

20  AND LEFT THE DOOR OPEN FOR A POSSIBLE FURTHER DEBRIEFING;

21  IS THAT CORRECT?

22  **A.**   THAT IS CORRECT.

23  **Q.**   AND DURING THE NEXT SEVERAL MONTHS PENDING

24  SENTENCING, YOU AND MR. ONTJES AND I HAD DISCUSSIONS ABOUT

25  THAT, CORRECT?

**A.**   YES, SIR.

**Q.**   AND WE SET UP ANOTHER INTERVIEW FOR I GUESS IT WAS IN MARCH -- MARCH OF THIS YEAR, MARCH 23, SOMETHING LIKE THAT?

**A.**   YES, SIR.

**Q.**   DO YOU REMEMBER WHAT THE DATE WAS?

**A.**   YES, SIR.  MARCH 23, 2009.

**Q.**   OKAY.  AND THAT'S THE DAY YOU HAD BEEN DISCUSSING, THAT THIS WAS DISCUSSED WITH MR. NUNEZ, CORRECT?

**A.**   YES, SIR.

**Q.**   THAT WAS IN FRANKLIN COUNTY JAIL?

**A.**   THAT'S CORRECT.

**Q.**   I WANT TO CLARIFY ONE THING.  WHEN WE SET UP THE SECOND DEBRIEFING, YOU WERE AWARE OF THIS EXHIBIT, THIS LETTER, CORRECT?

**A.**   YES, SIR.

**Q.**   ALL RIGHT.  BUT YOU HAD NOT INFORMED ME OF THAT, CORRECT?

**A.**   CORRECT.

**Q.**   SO WHEN WE GOT TO LOUISBURG, I DIDN'T KNOW THIS EXISTED UNTIL WE HAD BEEN THERE QUITE SOME TIME, CORRECT?

**A.**   YES, SIR.

**Q.**   AND MR. NUNEZ, WHEN YOU ASKED HIM ABOUT IT, I THINK YOU SAID HE INITIALLY DENIED IT BUT THEN DISCUSSED IT IN MORE DETAIL WITH YOU?

1  **A.**   YES, SIR.

2  **Q.**   AND IT'S MY UNDERSTANDING, AS I RECALL, THAT -- DID

3  HE AND I SAY THAT MR. ALLEN HAD ACTUALLY SORT OF COME TO

4  HIM AND THEY WERE SORT OF TALKING BACK AND FORTH ABOUT

5  THIS AND ABOUT CO-DEFENDANTS, AND THAT ACTUALLY MR. ALLEN

6  ACTUALLY WROTE SOME OF THIS INFORMATION ON HERE?

7  **A.**   I SPECIFICALLY STATED IN MY NOTES AND THE REPORT THAT

8  YOU ARE REFERRING TO, PARAGRAPH FIVE AND SIX, THAT MR.

9  NUNEZ STATED THAT HE HAD WROTE SEVERAL LETTERS, OR MORE

10 THAN ONE LETTER, AND THAT THE LETTER WRITTEN BY ALLEN

11 INDICATED THAT THERE WAS A $20,000 BOUNTY FOR THE MURDER

12 OF PHILLIP MORGAN, JIMMY BROGDEN, AND ADDITIONALLY $30,000

13 BOUNTY FOR THE MURDER OF DAVID MICHAEL JONES, IS

14 SPECIFICALLY WHAT I HAVE IN MY NOTES.

15 **Q.**   BUT DID HE NOT SAY THAT THEY WERE SAYING THAT

16 TOGETHER AND THEY WERE TALKING, AND MR. ALLEN WAS TAKING

17 SOME NOTES OR MADE SOME OF THE WRITING HIMSELF?

18 **A.**   MR. ASHTON, I CAN JUST TELL YOU WHAT I HAVE IN MY

19 REPORT.

20 **Q.**   ALL RIGHT.  NOW, AS FAR AS YOU KNOW, ALL MR. ALLEN

21 DID WITH THAT LETTER WAS TAKE IT TO HIS LAWYER, CORRECT?

22 **A.**   YES, SIR.

23 **Q.**   AND THE INFORMATION ON THERE IS ON ARREST WARRANTS OR

24 DIFFERENT DOCUMENTS THAT COULD HAVE PERTAINED TO THESE

25 PEOPLE, CORRECT?

1   **A.**   YES, SIR.

2   **Q.**   AND AFTER MR. NUNEZ AND YOU DISCUSSED THIS LETTER,

3   THE DEBRIEFING ON THIS CASE CONTINUED, CORRECT?

4   **A.**   I'M NOT SURE I UNDERSTAND YOUR QUESTION.

5   **Q.**   AFTER THIS LETTER WAS DISCUSSED, THE DEBRIEFING

6   ACTUALLY CONTINUED, CORRECT?

7   **A.**   YES, SIR.

8   **Q.**   AND MR. NUNEZ SPOKE WITH YOU IN MORE DETAIL ABOUT

9   THIS DRUG CASE AND HIS DEALINGS WITH MR. JONES AND OTHERS,

10  CORRECT?

11  **A.**   YES, SIR.  VERY DETAILED.

12  **Q.**   ALL RIGHT.  SO HE PROVIDED SUBSTANTIALLY MORE

13  INFORMATION AT THAT DEBRIEFING THAN HE HAD BEFORE,

14  CORRECT?

15  **A.**   YES, SIR.

16  **Q.**   AND HE INDICATED THAT IN THE FUTURE HE WOULD STILL BE

17  WILLING TO COOPERATE IF NECESSARY IF YOU WORKED FURTHER ON

18  THESE CASES?

19  **A.**   YES, SIR.

20  **Q.**   AND I BELIEVE A LATER TIME HE EVEN PASSED THROUGH TO

21  ME THAT HE HAD HEARD SOME INFORMATION ABOUT A ROCKY MOUNT

22  MURDER CASE WHILE HE WAS IN JAIL, CORRECT?

23  **A.**   YES, SIR.

24  **Q.**   AND THAT'S BEEN PASSED ON TO YOUR AGENT IN ROCKY

25  MOUNT AND ONTO THE ROCKY MOUNT DETECTIVES?

1  **A.**   YES, SIR.  I SPECIFICALLY HAD A DISCUSSION WITH THE

2  AGENT THAT WORKS IN OUR OFFICE FROM THE ROCKY MOUNT POLICE

3  DEPARTMENT AFTER YOU AND I HAD OUR DISCUSSION.  RELAYED TO

4  MR. NUNEZ THE INFORMATION HE PROVIDED CONCERNING THE

5  MURDERS, AND THE INFORMATION WAS PASSED ON TO THE ROCKY

6  MOUNT OFFICERS, AND THE LAST INFORMATION I RECEIVED FROM

7  THEM IS THAT THAT WAS A SOLVED HOMICIDE.  I HAVE NOT

8  RECEIVED ANY OTHER INFORMATION FROM THE ROCKY MOUNT POLICE

9  DEPARTMENT AT THIS TIME.

10  **Q.**   IT WAS THAT IT WAS WHAT?

11  **A.**   IT WAS A SOLVED HOMICIDE.  IT HAD ALREADY BEEN

12  SOLVED.  THAT'S WHAT THEY TOLD ME.

13          **MR. ASHTON:**  THAT'S ALL I HAVE.  THANK YOU.

14          **THE COURT:**  ANY FOLLOW-UP?

15          **MR. ONTJES:**  NO, YOUR HONOR.

16          **THE COURT:**  THANK YOU, AGENT.  YOU MAY STEP

17  DOWN.  ANY OTHER WITNESSES, MR. ONTJES?

18          **MR. ONTJES:**  JUDGE DEVER, AGAIN, I'M PREPARED TO

19  CALL LEWIS ALLEN, IF THE COURT WISHES TO HEAR FROM HIM.  I

20  SUBMIT, BASED ON THE TESTIMONY ALONE OF AGENT YORK, THAT

21  THE GOVERNMENT HAS PROVEN BY A PREPONDERANCE OF THE

22  EVIDENCE THAT THE DEFENDANT DID, IN FACT, AS DEFINED UNDER

23  3C1.1, OBSTRUCT THIS INVESTIGATION OR THIS CASE.

24          **THE COURT:**  WELL, MR. ASHTON INDICATED HE WANTED

25  TO EXAMINE HIM.  I'LL LET MR. ASHTON CALL HIM IF HE WANTS

1   TO.  DO YOU WANT TO CALL HIM?

2              **MR. ASHTON:**  I JUST WANTED TO ASK HIM ABOUT

3   ANOTHER LETTER THAT MR. ALLEN WROTE HIM AFTERWARDS.

4              **THE COURT:**  WHY DON'T YOU CALL HIM, MR. ONTJES,

5   AND MR. ASHTON CAN EXAMINE HIM.

6              **MR. ONTJES:**  THE GOVERNMENT WILL CALL LEWIS

7   ALLEN.

8   **LEWIS C. ALLEN**, BEING FIRST DULY SWORN, TESTIFIED AS

9   FOLLOWS DURING **DIRECT EXAMINATION**:

10             **THE COURT:**  GOOD MORNING, MR. ALLEN.  MR. ONTJES

11  WILL HAVE SOME QUESTIONS FOR YOU, THEN MR. ASHTON OVER AT

12  THIS TABLE WILL HAVE QUESTIONS FOR YOU.  IF ONE OF THE

13  LAWYERS OBJECTS TO THE OTHER LAWYER'S QUESTION, DON'T SAY

14  ANYTHING UNTIL I HAVE RULED ON THE OBJECTION.

15      MR. ONTJES, YOU MAY EXAMINE MR. ALLEN.

16  **BY MR. ONTJES:**

17  **Q.**   GOOD MORNING, MR. ALLEN.  HOW ARE YOU?

18  **A.**   FINE, SIR.

19  **Q.**   YOU UNDERSTAND WHY YOU ARE HERE TODAY; IS THAT

20  CORRECT?

21  **A.**   YES, SIR.

22  **Q.**   YOU ARE SUBPOENAED BY THE GOVERNMENT AS PART OF YOUR

23  PLEA AGREEMENT TO TESTIFY IN THE MATTER INVOLVING THE

24  DEFENDANT, MR. NUNEZ?

25  **A.**   YES.

1  **Q.**  NOW MR. ALLEN, JUST SORT OF SOME BACKGROUND

2  INFORMATION.  I BELIEVE YOU PREVIOUSLY PLED GUILTY

3  PURSUANT TO A PLEA AGREEMENT WITH THE GOVERNMENT TO ARMED

4  BANK ROBBERY AND POSSESSION OF FIREARM DURING A CRIME OF

5  VIOLENCE; IS THAT RIGHT?

6  **A.**  YES.

7  **Q.**  IN FACT, I'M HOLDING IN MY HAND THE PLEA AGREEMENT

8  WHICH YOU SIGNED AND ENTERED BEFORE JUDGE DEVER, I BELIEVE

9  IT WAS BACK ON OCTOBER 6, 2008; DO YOU REMEMBER THAT?

10  **A.**  YEAH.

11  **Q.**  AND THAT AS PART OF YOUR PLEA AGREEMENT, YOU AGREED

12  TO COOPERATE WITH THE GOVERNMENT, WHEN CALLED UPON,

13  WHETHER THAT BE IN TESTIMONY OR IN DEBRIEFS?

14  **A.**  YES.

15  **Q.**  YOU UNDERSTAND THAT'S PART OF YOUR PLEA AGREEMENT?

16  **A.**  YES.

17  **Q.**  AND AS PART OF MY AGREEMENT, AS FAR AS THE UNITED

18  STATES IS CONCERNED, THAT I WOULD MAKE THE COURT AWARE, IN

19  THIS CASE YOUR SENTENCING JUDGE, JUDGE DEVER, THE EXTENT

20  OF YOUR COOPERATION?

21  **A.**  YES.

22  **Q.**  DO YOU UNDERSTAND THAT?

23  **A.**  (NODDING.)

24  **Q.**  BUT HAVE ANY PROMISES BEEN MADE TO YOU AS FAR AS ANY

25  TYPE OF SENTENCE REDUCTION FOR YOUR COOPERATION TODAY?

1    **A.**    NO.

2    **Q.**    OKAY.  NOW, MR. ALLEN, I BELIEVE YOU WERE SENTENCED

3    NOT MORE THAN TWO WEEKS AGO, MAY 5 OF THIS YEAR TO

4    138-MONTHS BY THIS COURT, RIGHT?

5    **A.**    YES.

6    **Q.**    OKAY.  MR. ALLEN, I WANT TO TURN YOUR ATTENTION NOW

7    TO YOUR KNOWLEDGE AND RELATIONSHIP WITH THE DEFENDANT, MR.

8    NUNEZ.  FIRST OFF, DO YOU SEE MR. NUNEZ HERE TODAY IN

9    COURT?

10   **A.**    YES.

11   **Q.**    CAN YOU POINT HIM OUT FOR ME, PLEASE?

12   **A.**    SITTING OVER THERE WITH THE RED JUMPSUIT ON.

13           **MR. ONTJES:**  LET THE RECORD REFLECT THE WITNESS

14   IDENTIFIED THE DEFENDANT.

15           **THE COURT:**  THE RECORD WILL SO REFLECT.

16   **BY MR. ONTJES:**

17   **Q.**    MR. ALLEN, WHEN DID YOU FIRST MEET THE DEFENDANT?

18   **A.**    WAKE COUNTY JAIL, ROUGHLY IN OCTOBER OF '08.

19   **Q.**    OKAY.  BOTH OF YOU WERE HOUSED THERE TOGETHER?

20   **A.**    YES.

21   **Q.**    HOW DID YOU FIRST STRIKE UP A CONVERSATION; WHAT DID

22   YOU—ALL TALK ABOUT?

23   **A.**    I BELIEVE HE RECOGNIZED ME FROM A TELEVISION SHOW I

24   WAS ON CALLED "ULTIMATE FIGHTER."

25   **Q.**    WHAT IS "ULTIMATE FIGHTER?"

1    **A.**    IT'S PROFESSIONAL MIXED MARSHAL ARTS FIGHTING.    IT'S

2    TELEVISED.

3    **Q.**    THAT YOU WERE A PARTICIPANT IN?

4    **A.**    YES.

5    **Q.**    HE RECOGNIZED YOU FROM THAT SHOW?

6    **A.**    YES.

7    **Q.**    IN FACT, WERE YOU ON THAT SHOW?

8    **A.**    YES.

9    **Q.**    ALL RIGHT.    PLEASE CONTINUE.    WHAT ELSE DID YOU TALK

10   ABOUT INITIALLY?

11   **A.**    THEN WE STARTED TALKING ABOUT WHY HE WAS IN HERE,

12   STARTED EXCHANGING INFORMATION ABOUT WHAT WE DID ON THE

13   STREET.    I GAVE HIM INFORMATION ABOUT MY FIANCEE'S FATHER

14   OWNS A TRUCKING BUSINESS CALLED JACOBS TRANSPORTATION.

15   **Q.**    WHERE'S THAT BASED AT?

16   **A.**    OUT OF FAYETTEVILLE, NORTH CAROLINA.

17   **Q.**    THIS IS A TRUCKING BUSINESS?

18   **A.**    YEAH.

19   **Q.**    NOW, MR. ALLEN, YOU TWO EXCHANGED WHY YOU WERE IN

20   THERE.    YOU TOLD THE DEFENDANT ABOUT YOUR CHARGES?

21   **A.**    NO, I DIDN'T.    I TOLD HIM I WOULD BE GETTING OUT

22   SOON.    I DIDN'T GET INTO DETAIL ABOUT MY CHARGES.

23   **Q.**    SO YOU TOLD HIM YOU WERE GETTING OUT FAIRLY SOON?

24   **A.**    YES.

25   **Q.**    THAT'S NOT TRUE, IS IT, OBVIOUSLY?

```
1   A.    NO.

2   Q.    WHY DID YOU TELL HIM THAT?

3   A.    TO BE HONEST WITH YOU, I WAS EMBARRASSED TO GIVE MY

4   TRUE CHARGE.  ONE TIME I'M ON THE SHOW DOING WELL, THE

5   NEXT TIME I'M SITTING HERE FOR BANK ROBBERY.  I LIED TO A

6   LOT OF PEOPLE IN THE JAIL WHY I WAS INCARCERATED.  I TOLD

7   STORIES ABOUT BEING LOCKED UP FOR SELLING STEROIDS.  I

8   TOLD DIFFERENT STORIES THAT KIND OF MADE ME NOT LOOK AS

9   BAD AS ROBBING A BANK.

10  Q.    BECAUSE YOU WERE ON THIS TV SHOW AND YOU HAD A

11  REPUTATION TO MAINTAIN?

12  A.    (NODDING.)

13  Q.    DO YOU SPEAK SPANISH?

14  A.    YES.

15  Q.    ARE YOU FLUENT?

16  A.    YES.

17  Q.    DID THE DEFENDANT KNOW THAT?

18  A.    YES.

19  Q.    IN FACT, YOU TWO SPOKE IN SPANISH OCCASIONALLY?

20  A.    YES.

21  Q.    SO YOU TOLD HIM YOUR FIANCEE'S FATHER HAD A TRUCKING

22  BUSINESS?

23  A.    UH-HUH.

24  Q.    YOU SPOKE FLUENT SPANISH?

25  A.    UH-HUH.
```

1   **Q.**   AND YOU WERE PART OF THIS MIXED MARSHAL ARTS; YOU ARE

2   A TRAINED FIGHTER?

3   **A.**   RIGHT.

4   **Q.**   DID THERE COME A TIME, MR. ALLEN, THAT YOU TWO SPOKE

5   ABOUT THE DEFENDANT AND HIS INVOLVEMENT IN THE SALE OF

6   DRUGS?

7   **A.**   YES.

8   **Q.**   CAN YOU TELL JUDGE DEVER ABOUT THAT?

9   **A.**   WELL, THAT'S BASICALLY HOW THE WHOLE CONVERSATION

10   ABOUT DRUGS OCCURRED, BECAUSE MY FIANCEE'S FATHER OWNS

11   TRUCKS, AND THAT'S HOW HE TRANSPORTED LARGE AMOUNTS OF

12   DRUGS FROM ONE SPOT TO ANOTHER.

13   **Q.**   THIS IS WHAT THE DEFENDANT TOLD YOU?

14   **A.**   YES.

15   **Q.**   DID HE DETAIL TO YOU AS FAR AS WHERE THE DRUGS WERE

16   BEING SHIPPED FROM?

17   **A.**   YEAH.  MOST OF THE MARIJUANA WOULD BE SHIPPED FROM

18   LAREDO, TEXAS, TO DIFFERENT SPOTS.  HE GOT ARRESTED IN

19   CREEDMOOR BUT IT WAS DIFFERENT STATES THAT THEY WOULD BE

20   DROPPED OFF AT AS WELL.

21   **Q.**   DID HE IDENTIFY TO YOU THE SOURCES OF THE MARIJUANA?

22   **A.**   HIS GO-BETWEEN -- THE SOURCE WAS IN MEXICO, BUT THE

23   GO-BETWEEN, THE INDIVIDUAL WHO PROVIDED WAREHOUSING FOR

24   THE DRUGS WAS JOE PEREZ.

25   **Q.**   MR. PEREZ, WHERE WAS HE LIVING AT THE TIME, BASED ON

1  WHAT THE DEFENDANT TOLD YOU?

2  **A.**  CHINO HILLS, CALIFORNIA.

3  **Q.**  DID HE ALSO TELL YOU ABOUT HIS INVOLVEMENT IN COCAINE

4  TRAFFICKING?

5  **A.**  YEAH.  THAT CAME UP BECAUSE ANOTHER GUY THAT OWED HIM

6  LARGE AMOUNTS OF MONEY, MICHAEL JONES.

7  **Q.**  IS THAT DAVID MICHAEL JONES?

8  **A.**  DAVID MICHAEL JONES.

9  **Q.**  HE OWED MR. NUNEZ MONEY?

10  **A.**  INITIALLY THEY HAD DRUG TRANSACTIONS WHERE HE BEAT

11  HIM OUT OF MONEY, TOOK MONEY FROM HIM BECAUSE OF COCAINE,

12  AND STILL OWED HIM A LARGE AMOUNT OF MONEY.  I BELIEVE HE

13  WAS WORKING IT OFF WITH TRANSPORTATION.  THEN THE OTHER

14  TWO CO-DEFENDANTS IN THIS CASE, JIMMY BROGDEN AND WAYNE --

15  I CAN'T REMEMBER THE WHOLE NAME -- BUT THE OTHER TWO

16  CO-DEFENDANTS ON THIS CASE, THEY ARE THE ONES THAT

17  SNITCHED ON HIM, AND MICHAEL JONES ALSO, YOU KNOW,

18  INITIATED THE SNITCHING PROCESS.  SO THAT'S WHEN HE BECAME

19  INDEBTED TOWARDS THEM, WISHING SOMETHING COULD HAPPEN TO

20  THEM.

21  **Q.**  BEFORE WE GET TO THAT PART, LET ME FINISH THIS, IF

22  YOU COULD.  AS FAR AS THE DRUG BUSINESS PART OF YOUR

23  CONVERSATION WITH THE DEFENDANT, DID AT SOME POINT HE

24  SOLICIT YOU TO GET INVOLVED IN THE DRUG BUSINESS?

25  **A.**  YEAH.  HE TOLD ME THERE WAS A LOT OF OPPORTUNITIES IN

1    THE BUSINESS, AS FAR AS PROVIDING INFORMATION AND THEN,

2    YOU KNOW, WHEN I GET OUT HE'LL HOOK ME UP WITH CONNECTIONS

3    AND I COULD PROVIDE TRANSPORTATION FOR HIS PEOPLE TO GET

4    THE TRUCKS ROLLING.  AT THIS POINT IN TIME, HE THOUGHT HE

5    WOULD DO LIKE 18-MONTHS, A LITTLE OVER OR SOMETHING.

6    **Q.**   HE BEING THE DEFENDANT?

7    **A.**   YEAH.  MR. NUNEZ.  SO I PROVIDED TRANSPORTATION FOR

8    THE TRUCKS AND HE KIND OF GOT INTO DETAIL ABOUT, YOU KNOW,

9    I COULD BE PAID 10,000 A KEY OR I COULD -- FOR ONE LOAD I

10   COULD BE PAID A HUNDRED THOUSAND DOLLARS.

11   **Q.**   SO THESE ARE THE AMOUNTS OF MONEY YOU COULD BE MAKING

12   IF YOU AGREED TO JOIN THIS DRUG CONSPIRACY?

13   **A.**   YEAH.  AND THE DRIVERS MAKE $20,000.  SO WHATEVER OUT

14   OF THE HUNDRED THOUSAND DOLLARS, I WOULD PAY MY DRIVERS TO

15   TRANSPORT.

16   **Q.**   WHO, MR. ALLEN, WERE YOU SUPPOSED TO CONTACT ONCE YOU

17   GOT OUT TO GET INVOLVED IN THIS ORGANIZATION, DID HE TELL

18   YOU?

19   **A.**   JOE PEREZ.

20   **Q.**   JOE PEREZ.  THE INDIVIDUAL YOU DESCRIBED AS LIVING IN

21   CALIFORNIA?

22   **A.**   YES.

23   **Q.**   OKAY.  ANYBODY ELSE THAT THE DEFENDANT INDICATED WAS

24   INVOLVED IN THIS ORGANIZATION AS FAR AS FAMILY MEMBERS, OR

25   ANYTHING LIKE THAT?

1  **A.**   HIS BROTHER HENRY, HE'S ACTUALLY THE ONE WHO ABDUCTED

2  (SIC) HIM INTO THE WHOLE DRUG CARTEL BUSINESS.  HE KIND OF

3  SHOWED HIM THE ROPES.  HE'S DOING TIME ACTUALLY IN TEXAS

4  NOW.  ONCE HE GOT OUT, THEN ME AND HIM WOULD CONNECT AND

5  KEEP IT ROLLING.

6  **Q.**   ALL RIGHT.  NOW, LET ME TURN YOUR ATTENTION TO THE

7  THREAT.  I THINK YOU'VE ALREADY INDICATED THAT THE

8  DISCUSSION ABOUT THE DEFENDANT'S CO-CONSPIRATORS CAME UP;

9  MR. MICHAEL JONES, DAVID MICHAEL JONES, PHILLIP MORGAN,

10  JIMMY BROGDEN, THOSE INDIVIDUALS WERE DISCUSSED?

11  **A.**   (NODDING.)

12  **Q.**   TELL JUDGE DEVER HOW IT CAME ABOUT THAT THE DEFENDANT

13  SOLICITED YOU TO KILL THESE INDIVIDUALS?

14  **A.**   WELL, LIKE I SAID, THEY ARE THE CAUSE OF HIM BEING IN

15  HERE.  THEY SNITCHED ON HIM.  SO THAT'S -- OF COURSE

16  THAT'S WHAT MADE HIM IN DEBT TO CHALLENGE THEM.  I WAS TO

17  GET OUT FIRST.  IT WAS LIKE I HAD A LOT OF OPPORTUNITY IN

18  IT FOR YOU, THERE'S A LOT OF MONEY TO BE MADE FOR THEM TO

19  BE TAKEN CARE OF.  I AT FIRST THOUGHT HE WAS TALKING

20  BECAUSE HE'S MAD AT THESE GUYS, THEY TOLD ON HIM.  HE TOLD

21  ME, HE SAID, ONE GUY, MICHAEL JONES, HAS ABOUT

22  $1.5 MILLION IN HIS WALL AND THE OTHER GUY --

23  **Q.**   WALL?  WHAT WALL?

24  **A.**   IN HIS WALL ON THE SIDE OF HIS HOUSE.

25  **Q.**   OKAY.

1  **A.**   AND MICHAEL JACOBS STILL OWED HIM WHATEVER THE AMOUNT

2  WAS, IT CAME UP IN DOLLAR AMOUNTS TO $40,000 WORTH OF

3  MARIJUANA.

4  **Q.**   NOW MR. JACOBS, THAT'S ANOTHER INDIVIDUAL UNRELATED

5  TO THE CASE IN WHICH THE DEFENDANT WAS ARRESTED?

6  **A.**   YEAH.  HE IS SOMEONE TOTALLY SEPARATE.  BUT ME

7  GETTING OUT COLLECTING THIS MONEY AND TAKING CARE OF THEM

8  WOULD PROVE MY LOYALTY, YOU KNOW, TO THE ORGANIZATION, I

9  SUPPOSE.  SO INFORMATION WAS PROVIDED TO ME NOT TOO LONG

10 AFTER WE HAD THAT CONVERSATION.

11 **Q.**   THIS CONVERSATION OCCURRED WHERE AGAIN, MR. ALLEN?

12 **A.**   WHAT?

13 **Q.**   WHERE DID THIS CONVERSATION OCCUR?

14 **A.**   IN BLUE 5, WAKE COUNTY JAIL.

15 **Q.**   THAT'S CELL BLOCK 5 BLUE?

16 **A.**   YES.

17 **Q.**   AND YOU WERE HOUSED WITH THE DEFENDANT THERE?

18 **A.**   YES.

19 **Q.**   THIS INFORMATION, I BELIEVE YOU SUBSEQUENTLY TURNED

20 OVER TO YOUR ATTORNEY, MR. SLADE TRABUCCO; IS THAT

21 CORRECT?

22 **A.**   YES.

23 **Q.**   WHO PROVIDED YOU -- I'M GOING TO SHOW YOU, IF I MAY

24 APPROACH YOUR HONOR, WHAT'S PREVIOUSLY INTRODUCED AS

25 GOVERNMENT'S EXHIBIT NO. 1.  I'LL HAVE YOU IDENTIFY THAT

1   FOR ME, PLEASE.  DO YOU RECOGNIZE THAT, MR. ALLEN?

2   **A.**   YES.

3   **Q.**   WHAT IS THAT?

4   **A.**   THAT'S THE INFORMATION PROVIDED TO ME BY MR. NUNEZ.

5   THAT WAS THE INFORMATION THAT I WOULD GO OFF OF TO CARRY

6   OUT THE ASSASSINATION, OR HIT, WHATEVER.

7   **Q.**   THE HIT?

8   **A.**   YES.

9   **Q.**   WHO WROTE THAT?

10   **A.**   I DIDN'T PHYSICALLY SEE MR. NUNEZ WROTE IT, BUT MR.

11   NUNEZ PROVIDED IT TO ME.

12   **Q.**   DID YOU WRITE IT?

13   **A.**   NO.

14   **Q.**   SO DID THERE COME A POINT -- HE GAVE YOU THIS LETTER?

15   **A.**   YES.

16   **Q.**   WITH INSTRUCTIONS?

17   **A.**   YES.

18   **Q.**   AND I THINK THE DOLLAR AMOUNTS ARE BY EACH

19   INDIVIDUAL?

20   **A.**   YES.

21   **Q.**   AND WHAT WERE YOU TOLD ABOUT THE DOLLAR AMOUNTS?  HOW

22   WAS THAT GOING TO BE PAID AND FOR WHAT?

23   **A.**   THAT WOULD BE PAID THROUGH JOE PEREZ.  I WOULD

24   CONTACT HIM AND TELL HIM ABOUT THE SITUATION, TELL HIM

25   WHAT I COULD PROVIDE AND I WOULD TAKE CARE OF IT AND HE

1   WOULD BE THE ONE TO TAKE CARE OF THE OTHER.

2   **Q.**   SO MR. PEREZ, WHO IS ON THE OUTSIDE, WOULD PAY YOU

3   ONCE YOU HAD TAKEN OUT THESE INDIVIDUALS?

4   **A.**   RIGHT.

5   **Q.**   DURING THIS TIME, MR. ALLEN, YOU ARE PLAYING ALONG?

6   **A.**   YES.

7   **Q.**   YOU ARE TELLING HIM YOU ARE IN AGREEMENT?

8   **A.**   YES.

9   **Q.**   OKAY.  ANY INTENTION OF DOING ANY OF THIS?

10  **A.**   NO.

11  **Q.**   WITH THIS LETTER IN HAND, WHAT DID YOU DO WITH IT?

12  **A.**   TURNED IT OVER TO SLADE TRABUCCO.  WELL, FIRST I MET

13  WITH ROSEMARY GODWIN AND TIM GAINES, FBI, AND I EXPLAINED

14  TO HIM THE SITUATION.  I DIDN'T SEE MY LAWYER, WHICH IS

15  ROSEMARY GODWIN, FOR A COUPLE WEEKS AFTER THAT.  THEN I

16  SUPPOSE A CONFLICT OF INTEREST, SHE HAD TO REMOVE HERSELF

17  OUT OF THE CASE.  SO THEN SLADE TRABUCCO CAME DOWN AND I

18  TOLD HIM.

19          **MR. ONTJES:**  YOUR HONOR, APOLOGIZE.  I MAY HAVE

20  MISSPOKE.  MS. ROSEMARY GODWIN WAS INITIALLY HIS ATTORNEY.

21  DUE TO THE CONFLICT THAT AROSE OUT OF THIS, THE FEDERAL

22  PUBLIC DEFENDER REPRESENTED ONE OF THESE, THEY HAD TO

23  WITHDRAW AND SLADE TRABUCCO TOOK OVER.

24          **THE COURT:**  OKAY.

25  **BY MR. ONTJES:**

1   **Q.**   YOU SUBSEQUENTLY PROVIDED THE LETTER TO MR. TRABUCCO,

2   WHO IN TURN PROVIDED IT TO AGENT YORK?

3   **A.**   YES.

4   **Q.**   AND YOU WERE SUBSEQUENTLY INTERVIEWED BY AGENT YORK

5   ABOUT THIS INCIDENT?

6   **A.**   YES.

7   **Q.**   YOU MENTIONED AGENT GAINES AND --

8   **A.**   YES.

9   **Q.**   WAS HE THE CASE AGENT IN YOUR CASE, THE BANK ROBBERY?

10  **A.**   YES.

11  **Q.**   I WANT TO BRING OUT ANOTHER LETTER INTERCEPTED BY LAW

12  ENFORCEMENT THAT I BELIEVE YOU WROTE.  I PROVIDED A COPY

13  OF THIS LETTER TO DEFENSE COUNSEL.

14      MR. ALLEN, I'M GOING TO SHOW YOU WHAT'S PREVIOUSLY

15  MARKED AS GOVERNMENT'S EXHIBIT NO. 2, AND ASK YOU TO TAKE

16  A LOOK AT THAT.  DO YOU RECOGNIZE THAT?

17  **A.**   YES.

18  **Q.**   WHAT'S THAT?

19  **A.**   IT'S A LETTER I WROTE TO AN INDIVIDUAL THAT PROVIDED

20  A GUN THAT I USED IN MY ROBBERIES.

21  **Q.**   I THINK THE INDIVIDUAL'S NAME IS PATTY?

22  **A.**   YES.

23  **Q.**   WHO'S PATTY?

24  **A.**   SHE'S THE ONE WHO PURCHASED THE GUN AND GAVE IT TO

25  ANOTHER INDIVIDUAL, WHO IN TURN SOLD IT TO ME.

1   **Q.**   THAT OTHER INDIVIDUAL'S NAME, I BELIEVE YOU REFERRED

2   TO HIM IN THE LETTER AS CHIEF?

3   **A.**   HIS NAME IS HEATH.

4   **Q.**   HEATH?  THAT'S HIS REAL NAME?

5   **A.**   YES.

6           **MR. ONTJES:**  YOUR HONOR, AT THIS TIME IF I MAY

7   INTRODUCE GOVERNMENT'S EXHIBIT NO. 2 AND PUBLISH IT?

8           **THE COURT:**  IT WILL BE RECEIVED.

9   **BY MR. ONTJES:**

10  **Q.**   THE LETTER INDICATES, MR. ALLEN, THAT -- IT APPEARS

11  TO INDICATE THAT YOU ARE SOLICITING, IN EXCHANGE FOR YOUR

12  SILENCE, SOLICITING SUPPORT FROM PATTY AND HEATH, SUPPORT

13  TO YOUR FIANCEE ON THE OUTSIDE?

14  **A.**   YES.

15  **Q.**   CAN YOU EXPLAIN THAT?

16  **A.**   WELL, I WAS INTERVIEWED BY TIM GAINES ON TWO

17  DIFFERENT OCCASIONS.  THE FIRST TIME I DIDN'T COOPERATE

18  WITH HIM.  THE SECOND TIME I SLIGHTLY COOPERATED WITH HIM.

19  I TOLD HIM, I SAID THE GUY'S NAME IS HEATH, WHICH I ONLY

20  KNEW HIS FIRST NAME.

21  **Q.**   SO YOU TOLD AGENT GAINES IN THE SECOND INTERVIEW THAT

22  HEATH IS THE ONE THAT PROVIDED THE GUN?

23  **A.**   YES.  AND ALSO TOLD HIM HE WORKED AT A PLACE CALLED

24  PUROLATOR.  SO NOTHING CAME ABOUT, YOU KNOW, SIX OR SEVEN

25  MONTHS PASSED, NOTHING CAME ABOUT, NO ONE WAS ARRESTED.

1  SO I FIGURED HE WAS STILL OUT THERE, I'M NOT PURSUING THE

2  ISSUE OF HIM BEING ARRESTED, SO HE GOT OFF SCOTT FREE.

3  **Q.**   IT'S NOT YOUR JOB TO PURSUE HIM, RIGHT?

4  **A.**   I PROVIDED THE INFORMATION.  THE AGENT PURSUED THE

5  INFORMATION.  I FIGURED, NO ONE HAS BEEN ARRESTED, HE'S

6  STILL ON THE STREETS.  I ASKED MY FIANCEE, "HAS HE EVER

7  COME AND SAID ANYTHING TO YOU OR ASKED IF YOU NEED

8  ANYTHING?"  SHE SAID, "I NEVER SEEN HIM."  SO I'M LIKE ALL

9  RIGHT.  SO THAT'S WHEN I WANT TO WRITE THE LETTER, SAID

10  WHY DON'T YOU GO OVER SOME TIME AND SHOW SOME

11  APPRECIATION, YOU ARE STILL OUT THERE AND I'M IN HERE.

12  THEY PUT PRESSURE ON ME TO COOPERATE WITH THEM, YOU KNOW.

13  **Q.**   BUT THEY DIDN'T SPECIFICALLY TALK TO YOU ABOUT HEATH,

14  OTHER THAN WHAT YOU PREVIOUSLY MENTIONED?

15  **A.**   NO.

16  **Q.**   WAS IT YOUR INTENTION TO EXTORT PATTY AND HEATH TO

17  PROVIDE SUPPORT FOR YOUR FIANCEE?

18  **A.**   HEATH LIVES IN A ONE BEDROOM APARTMENT WHICH HE

19  SHARES WITH A ROOMMATE.  HE WORKS AT PUROLATOR, WHICH IS A

20  MANUAL LABOR JOB.  HE MAKES ABOUT $10 AN HOUR AND HE SELLS

21  GUNS ON THE SIDE, SO FINANCIALLY I DON'T THINK HE CAN

22  PROVIDE MUCH SUPPORT.

23  **Q.**   WHAT WAS YOUR INTENTION THAT MR. ALLEN DO?

24  **A.**   ANY KIND OF APPRECIATION HE CAN SHOW.  COME BY AND

25  SAY THANK YOU.  COME BY AND SAY, "ARE YOU ALL RIGHT, WOULD

1  YOU LIKE ME TO TAKE YOU UP AND SEE HIM?"  IT'S HARD FOR

2  HER TO COME UP AND SEE ME, SHE'S SO FAR AWAY.  ANY TYPE OF

3  APPRECIATION, GRATIFICATION FOR HIM STILL BEING OUT THERE

4  AND ME BEING IN HERE.

5  Q.  I BELIEVE YOU HAVE A SMALL CHILD WITH YOUR FIANCEE?

6  A.  YES.

7  Q.  HOW OLD?

8  A.  FIVE MONTHS.

9  Q.  OKAY.  NOW, MR. ALLEN, AFTER YOU HAD PROVIDED THIS

10  LETTER, BEING GOVERNMENT'S EXHIBIT NO. 1, DID IT COME TO

11  YOUR UNDERSTANDING THAT THE LETTER WAS TURNED OVER TO MR.

12  NUNEZ AND HIS COUNSEL?  DID IT COME TO YOUR UNDERSTANDING;

13  DID YOU COME TO LEARN THAT?

14  A.  (NODDING.)

15  Q.  AS A RESULT OF THAT, MR. ALLEN, DID SOME INDIVIDUALS

16  APPROACH YOU IN THE WAKE COUNTY JAIL?

17  A.  YEAH.  THREE HISPANIC MALES KNOWN AS THE LATIN KING

18  GANG.

19  Q.  I WANT JUDGE DEVER TO HEAR ALL ABOUT THIS.  WHERE DID

20  THIS OCCUR?

21  A.  EIGHT BLUE.

22  Q.  EIGHT BLUE, WAKE COUNTY JAIL?

23  A.  WAKE COUNTY JAIL.

24  Q.  AND DO YOU KNOW THESE INDIVIDUALS?

25  A.  I DON'T KNOW THEM FROM ANY PREVIOUS -- NO, NOT

1  PREVIOUSLY, JUST FROM THAT POD WE WERE IN.

2  **Q.**   DID YOU RECOGNIZE AT LEAST ONE OF THEM?

3  **A.**   YEAH, I RECOGNIZED ONE OF THEM.

4  **Q.**   WHO WAS THAT?

5  **A.**   ERVIN VASQUEZ.

6  **Q.**   DID MR. VASQUEZ INITIATE THE CONVERSATION?

7  **A.**   YES.

8  **Q.**   CAN YOU TELL US ABOUT THAT CONVERSATION?

9  **A.**   WELL, HE TOLD ME THAT SOMEHOW THEY FOUND OUT

10  INFORMATION THAT -- GUYS COME BACK FROM FRANKLIN COUNTY

11  JAIL ALL THE TIME, BECAUSE THE GUY RUNNING THE FRANKLIN

12  COUNTY JAIL, YOU DO ANYTHING WRONG, HE'LL SEND YOU RIGHT

13  BACK TO WAKE COUNTY.

14  **Q.**   AT THE TIME I BELIEVE MR. NUNEZ HAD BEEN REMOVED OR

15  TAKEN OUT OF WAKE COUNTY AND PLACED AT FRANKLIN COUNTY

16  JAIL?

17  **A.**   RIGHT.

18  **Q.**   THAT WAS AT MY REQUEST?

19  **A.**   RIGHT.

20  **Q.**   ONCE YOUR LETTER BECAME PUBLIC, IF YOU WILL, TO THE

21  DEFENDANT?

22  **A.**   RIGHT.

23  **Q.**   OKAY.  PLEASE CONTINUE.

24  **A.**   OKAY.  SO I'M SPECULATING THIS IS HOW HE FOUND THE

25  INFORMATION OUT, IS WHEN ANOTHER HISPANIC MALE WAS

```
1   TRANSFERRED BACK FROM FRANKLIN COUNTY JAIL FOR FIGHTING

2   WITH SOMEBODY, THEY WERE MOVED TO A POD ACROSS THE HALL.

3   SO THEY WERE COMMUNICATING THROUGH THE WINDOWS.  THE OTHER

4   THREE HISPANIC MALES WITH THIS ONE THAT CAME FROM FRANKLIN

5   COUNTY, SO THIS IS MY SPECULATION ABOUT HOW THEY FOUND OUT

6   THE SITUATION --
```

7          **MR. ASHTON:**  OBJECTION TO SPECULATION.

8          **THE COURT:**  SUSTAINED.

9   **BY MR. ONTJES:**

10  **Q.**  LET'S NOT SPECULATE.  DID THIS INDIVIDUAL THAT YOU

11  IDENTIFIED TELL YOU ANYTHING, AS FAR AS THE MESSAGE FROM

12  THE DEFENDANT?

13         **MR. ASHTON:**  OBJECTION.

14         **THE COURT:**  OVERRULED.

15  **A.**  YES.

16         **THE COURT:**  WHAT DID VASQUEZ SAY TO YOU?

17         **THE WITNESS:**  HE TOLD ME HE HEARD SOMEBODY

18  SNITCHING ON MR. NUNEZ ON HIS CASE, AND WE REFERRED TO HIM

19  AS L.A.

20  **Q.**  IS L.A. MR. NUNEZ'S NICKNAME?

21  **A.**  YES.  WE HEARD SOMEBODY WAS SNITCHING ON L.A. AND

22  THEY WOULD TAKE CARE OF IT, THEY WOULD TALK TO ME MORE

23  ABOUT IT WHEN WE CAME BACK OUT.  SO THEY GO IN THE CELL,

24  COME BACK OUT OF THE CELL AFTER LOCKDOWN AND THEY COME

25  BACK TO MY CELL WITH HIS HANDS IN HIS PANTS, HIM AND TWO

1  OTHER GUYS.

2  **Q.**   HIM BEING WHO?

3  **A.**   ERVIN VASQUEZ.

4  **Q.**   OKAY.

5  **A.**   HE COMES UP TO MY CELL.  HE HAD HIS HANDS IN HIS

6  PANTS THE WHOLE TIME LOOKING NERVOUS, TALKING.  HE SAID,

7  "YEAH, I KNOW ABOUT IT, YOU KNOW.  I FOUND OUT WHAT WAS

8  GOING ON."  YEAH.  HE SAID, "YEAH.  HE TOLD ME TO GIVE YOU

9  THIS."  HE TOOK HIS HANDS OUT OF HIS PANTS.  HE HAD A

10  SHARP INSTRUMENT IN HIS PANTS MAYBE A TOOTHBRUSH SHARPENED

11  UP.

12  **Q.**   WHO HAD THE SHARPENED TOOTHBRUSH?

13  **A.**   ERVIN VASQUEZ.

14  **Q.**   WHAT DID HE DO WITH IT?

15  **A.**   HE SWUNG IT AT ME, HIT ME IN MY HAND.  WE WAS INSIDE

16  THE CELL.  WE BEGAN TO TUSSLE.  THE OTHER TWO GUYS CAME

17  IN, I'M TUSSLING WITH THEM AS WELL.

18  **Q.**   WHEN YOU SAY "TUSSLE," WHAT DID YOU DO TO DEFEND

19  YOURSELF, MR. ALLEN?

20  **A.**   I SECURED THEM WITH A BODY SLAM TO THE BED.  THE

21  WEAPON FELL OUT OF HIS HAND.  I SECURED MYSELF TO THE BACK

22  OF MY WALL, WITH MY BACK TO THE WALL, SO ONLY ONE CAN COME

23  AT A TIME.  I HIT THE SECOND ONE AND HE WENT DOWN.  I WENT

24  AFTER THE THIRD ONE, BUT HE RAN OUT THE CELL AND I RAN OUT

25  OF THE CELL AS WELL.  I WENT TO THE BACK OF THE HALLWAY,

1  SECURED MY BACK TO THE WALL, THEN THEY ALL LEFT OUT OF THE

2  CELL.

3  **Q.**   AT THAT TIME THEY ALL DISPERSED?

4  **A.**   YES.

5  **Q.**   DID YOU REPORT THIS TO THE JAILER?

6  **A.**   NO.  I DIDN'T FEEL COMFORTABLE BEING AROUND THEM BUT

7  I DIDN'T WANT TO REPORT IT.

8  **Q.**   WHY NOT?

9  **A.**   THEN I WOULD HAVE A REPUTATION IN THE JAIL OF GETTING

10  SOMEBODY IN TROUBLE.

11  **Q.**   SO YOU WERE AFRAID FOR YOUR SAFETY IF YOU REPORTED

12  IT?

13  **A.**   YES.

14  **Q.**   SO WHAT DID YOU DO?

15  **A.**   I STARTED ARGUING WITH THE OFFICERS.  THEY SENT ME TO

16  THE HOLE.

17  **Q.**   WHY DID YOU WANT TO GO TO THE HOLE?

18  **A.**   I DIDN'T FEEL COMFORTABLE AROUND THEM.  SO FOR MY

19  SAFETY.  I MEAN, WE GOT TO SLEEP EVENTUALLY SOMEHOW, SO IF

20  SOMETHING HAPPENED.

21  **Q.**   IN ADDITION TO THAT INCIDENT THAT OCCURRED IN YOUR

22  JAIL CELL, DID YOU LEARN ABOUT ANOTHER INCIDENT INVOLVING

23  YOUR FIANCEE AND YOUR SMALL CHILD?

24  **A.**   YES.  WELL, AFTER I TALKED TO HER, SHE --

25          **MR. ASHTON:**  OBJECTION.

| | |
|---|---|
| 1 | **THE COURT:** OVERRULED. GO AHEAD. |
| 2 | **THE WITNESS:** AFTER I TALKED TO HER, SHE SAID |
| 3 | TWO HISPANIC MALES WAS DRIVING BEHIND HER AND KEPT DRIVING |
| 4 | CLOSER AND CLOSER. SHE WOULD SPEED UP, SPEED UP, THINKING |
| 5 | MAYBE THEY WERE DRUNK OR SOMETHING. THEN SHE SAID HE |
| 6 | DROVE UP EVEN HARDER AND KIND OF BUMPED HER, LIKE TO DRIVE |
| 7 | HER OFF THE ROAD. SHE SWERVED OFF. SHE SEEN A KANGAROO |
| 8 | AND SEEN AN OFFICER OVER THERE. SHE PULLED INTO THE |
| 9 | KANGAROO AND THEY SPED OFF. |
| 10 | **BY MR. ONTJES:** |
| 11 | **Q.** YOUR CHILD WAS IN THE CAR AT THE TIME? |
| 12 | **A.** YES. |
| 13 | **Q.** THIS OCCURRED AFTER THE LETTER THAT YOU PROVIDED TO |
| 14 | AGENT YORK DETAILING THAT? |
| 15 | **A.** YES. |
| 16 | **MR. ONTJES:** YOUR HONOR, THAT'S ALL I HAVE. |
| 17 | **THE COURT:** CROSS-EXAMINATION. |
| 18 | **CROSS-EXAMINATION** |
| 19 | **BY MR. ASHTON:** |
| 20 | **Q.** MR. ALLEN, YOU PLED GUILTY TO WHAT, ARMED BANK |
| 21 | ROBBERY AND BRANDISHING A FIREARM DURING THE ROBBERY, |
| 22 | CORRECT? |
| 23 | **A.** YES. |
| 24 | **Q.** DID YOU EVER GET A SUBSTANTIAL ASSISTANCE MOTION? |
| 25 | **A.** NO. |

1   **Q.**   DID YOU EVER GET A 5K FILED ON YOUR BEHALF?

2   **A.**   I DON'T BELIEVE SO.  I'M NOT SURE.

3   **Q.**   NOW, PRIOR TO THESE CHARGES, WHAT HAVE YOU BEEN

4   CONVICTED OF?

5   **A.**   ARMED ROBBERY.

6   **Q.**   UP IN VIRGINIA?

7   **A.**   YES.

8   **Q.**   HOW ABOUT KIDNAPPING?

9   **A.**   YES.  ABDUCTION.

10   **Q.**   A SEPARATE OFFENSE?

11   **A.**   NO.  IT WAS ALTOGETHER.  ONE CHARGE WAS DROPPED.  IT

12   WAS ATTEMPTED ROBBERY, ENTERING INTO A RESIDENCE, HOLDING

13   SOMEBODY AGAINST THEIR WILL.  ROBBERY WAS DROPPED AND IT

14   WAS JUST HOLDING SOMEBODY AGAINST THEIR WILL AND ENTERING

15   INTO THE HOUSE UNLAWFULLY.

16   **Q.**   ALL RIGHT.  AND THEN WHEN YOU GOT PICKED UP ON THE

17   BANK ROBBERY HERE, YOU SIGNED A PLEA AGREEMENT, RIGHT?

18   **A.**   YES.

19   **Q.**   AND BASICALLY YOU AGREED TO COOPERATE WITH THE

20   GOVERNMENT; IS THAT TRUE?

21   **A.**   YES, SIR.

22   **Q.**   AND THEY WERE GOING TO GIVE YOU IMMUNITY FROM ANY

23   OTHER CHARGES; IS THAT RIGHT?

24   **A.**   NO.  IMMUNITY IS WHEN YOU --

25   **Q.**   IMMUNITY.  THEY WEREN'T GOING TO CHARGE YOU WITH

1  ANYTHING ELSE, WERE THEY?

2  **A.**  NO.

3  **Q.**  I BELIEVE THE PLEA AGREEMENT DISMISSED COUNT THREE AS

4  WELL; IS THAT RIGHT?

5  **A.**  YES.

6  **Q.**  WHAT WAS COUNT THREE?

7  **A.**  GUN BY CONVICTED FELONY.

8  **Q.**  WHAT?

9  **A.**  HAVING A GUN BY A CONVICTED FELON.

10  **Q.**  FIREARM BY A FELON?

11  **A.**  YES.

12  **Q.**  DID THEY ALSO AGREE TO A REDUCTION OF THREE LEVELS

13  FOR ACCEPTANCE OF RESPONSIBILITY, CORRECT?

14  **A.**  YES.

15  **Q.**  AND YOU EVENTUALLY GOT SENTENCED TO 138-MONTHS JUST

16  SEVERAL WEEKS AGO?

17  **A.**  YES.

18  **Q.**  NOW, YOU BEFRIENDED MR. NUNEZ AT THE WAKE COUNTY

19  JAIL, RIGHT?

20  **A.**  YES.

21  **Q.**  BUT IT WAS YOUR PURPOSE TO TRY TO FIND SOME

22  INFORMATION TO HELP YOURSELF; WAS IT NOT?

23  **A.**  NO.

24  **Q.**  YOU DIDN'T WANT TO GET SOME INFORMATION TO SEE IF YOU

25  COULD GET YOURSELF A SUBSTANTIAL ASSISTANCE MOTION?

1   **A.**   NO.  I WAS ALREADY SUPPOSED TO RECEIVE SUBSTANTIAL

2   ASSISTANCE MOTION FOR OTHER INFORMATION.  I WAS TOLD IT

3   DOESN'T MATTER HOW MUCH INFORMATION YOU TELL, IT'S GOING

4   TO BE THE SAME THING.

5   **Q.**   WELL, THAT'S NOT TRUE NOW.  THE MORE INFORMATION YOU

6   HAVE AND THE MORE YOU COOPERATE, THE BETTER YOUR SENTENCE

7   MIGHT BE; IS THAT NOT TRUE?

8   **A.**   POSSIBLY IT COULD BE TRUE, BUT THAT WASN'T MY INITIAL

9   INTENTIONS.

10  **Q.**   THIS PIECE OF PAPER, EXHIBIT NO. 1, IS THE ONLY

11  PERSON YOU SHOWED THAT TO YOUR ATTORNEY?

12  **A.**   YES, SIR.

13  **Q.**   ALL RIGHT.  YOU DIDN'T PASS IT ONTO ANYBODY ELSE,

14  RIGHT?

15  **A.**   NO.

16  **Q.**   OKAY.  AND YOUR ATTORNEY AT THE TIME WAS MR.

17  TRABUCCO, RIGHT?

18  **A.**   YES.

19  **Q.**   I BELIEVE YOU SAID YOU DIDN'T PLAN ON GETTING OUT AND

20  DOING ANYTHING WITH THESE PEOPLE, DID YOU?

21  **A.**   NO.

22  **Q.**   YOU NEVER PASSED ANY INFORMATION ONTO MR. JONES OR

23  MR. BROGDEN OR MR. MORGAN?

24  **A.**   NO.

25  **Q.**   DID YOU CALL ANYONE ON THE OUTSIDE ABOUT THIS?

1    **A.**    NO.

2    **Q.**    DID YOU WRITE TO ANYBODY ON THE OUTSIDE ABOUT THIS?

3    **A.**    NO.

4    **Q.**    DID YOU ASK ANYBODY TO LOOK INTO IT?

5    **A.**    NO.

6    **Q.**    DID YOU DO ANYTHING TO POSSIBLY WARN MR. JONES OR

7    MR. BROGDEN OR MR. MORGAN?

8    **A.**    NO.

9    **Q.**    DIDN'T CALL ANYBODY ABOUT THAT EITHER, RIGHT?

10    **A.**    NO.

11    **Q.**    NOW, IT WAS SOMETIME LATER YOU WROTE THIS LETTER TO,

12    IS IT PATTY BAKER, THAT WAS EXHIBIT NO. 2?

13    **A.**    YES.

14    **Q.**    DO YOU STILL HAVE THAT IN FRONT OF YOU?

15    **A.**    YES.

16    **Q.**    I KNOW IT'S AN EXHIBIT, BUT I'D LIKE YOU TO JUST TO

17    READ IT TO THE COURT.

18            **THE COURT:**  WELL, HOW ABOUT IF YOU JUST HAND IT

19    TO ME AND I'LL READ IT.  IT WILL SAVE A LITTLE TIME.

20        (PAUSE IN THE PROCEEDINGS.)

21        ALL RIGHT.  I HAVE READ IT.  IT IS PART OF THE RECORD

22    AS GOVERNMENT'S EXHIBIT 2.  NEXT QUESTION.

23    **BY MR. ASHTON:**

24    **Q.**    MR. ALLEN, ARE YOU SURE YOU DIDN'T WRITE SOME OF THIS

25    INFORMATION ON EXHIBIT 1?

**A.** YES.

**Q.** YOU ARE POSITIVE?

**A.** YES.

**Q.** HAVE YOU GOT THAT IN FRONT OF YOU?

**A.** YES.

**Q.** EXHIBIT 1 IS THIS (INDICATING). DO YOU HAVE BOTH OF THEM IN FRONT OF YOU?

**A.** YES.

**Q.** LOOK AT THE P ON PATTY AND THE P ON PHILLIP MORGAN.

        **MR. ONTJES:** I'M GOING TO OBJECT. I THINK THE WITNESS ANSWERED THE QUESTION ON WHETHER HE WROTE THE LETTER, AND HE ANSWERED HE DID NOT. THEREFORE, I THINK THIS NEXT LINE OF QUESTIONING REALLY --

        **THE COURT:** OVERRULED. I'LL LET MR. ASHTON DEVELOP THIS FOR A LITTLE BIT. GO AHEAD. DO YOU UNDERSTAND THE QUESTION, MR. ALLEN?

        **THE WITNESS:** YES.

        **THE COURT:** NEXT QUESTION.

**BY MR. ASHTON:**

**Q.** DID YOU NOT WRITE BOTH OF THOSE P'S, THE PATTY AND PHILLIP?

        **THE COURT:** ASKED AND ANSWER. OBJECTION SUSTAINED. NEXT QUESTION.

**BY MR. ASHTON:**

**Q.** LOOK AT THE LL IN YOUR OWN NAME, LEWIS ALLEN. DO YOU

1  SEE THAT?  I THINK IT'S ON THE SECOND PAGE OF EXHIBIT

2  NO. 2.

3  **A.**   YES.

4  **Q.**   LOOK AT THE LL ON EXHIBIT 1 IN GRANVILLE AND PHILLIP.

5  DO THOSE LL'S LOOK IDENTICAL TO YOU?

6  **A.**   NO.

7  **Q.**   YOU SURE YOU DIDN'T WRITE BOTH OF THOSE?

8  **A.**   I'M SURE.

9  **Q.**   HOW ABOUT THE NC.  LOOK AT THE NC ON EXHIBIT NO. 2

10 DOWN THERE UNDER YOUR NAME.  YOU GOT RALEIGH SPELLED WRONG

11 BUT YOU HAVE NC AFTER THAT.  SEE THAT?

12 **A.**   ON EXHIBIT 2?

13 **Q.**   EXHIBIT 1, OXFORD, NORTH CAROLINA, NC.  YOU STILL

14 SAYING YOU DIDN'T WRITE BOTH OF THOSE?

15 **A.**   NO.  I DIDN'T.

16 **Q.**   NOW, YOU ARE SAYING YOU WROTE THE LETTER TO PATTY

17 BECAUSE YOU WANTED SOMEBODY TO THANK YOU FOR KEEPING YOUR

18 MOUTH SHUT, RIGHT?

19 **A.**   ANY FORM OF APPRECIATION.

20 **Q.**   WHAT ELSE DID YOU WANT BESIDES APPRECIATION?

21 **A.**   NOTHING ELSE I CAN HAVE BESIDES APPRECIATION.  LIKE I

22 SAID BEFORE, ONE OF THEM LIVES IN A ONE BEDROOM APARTMENT

23 WITH A ROOMMATE WORKING AT MANUAL LABOR JOB, SELLING GUNS

24 ON THE SIDE.  FINANCIALLY THERE'S NOTHING ELSE THEY CAN DO

25 FOR ME, EXCEPT MAYBE BRING UP MY FIANCEE TO SEE ME, CHANGE

1    A TIRE FOR HER, OR ANYTHING.

2    **Q.**   PATTY ACTUALLY STRAW PURCHASED WEAPONS FOR OTHER

3    PEOPLE, RIGHT?

4    **A.**   YES.

5    **Q.**   SHE PURCHASED THIS GUN FOR HEATH FLANAGAN.  IS THAT

6    HIS NAME?

7    **A.**   I KNOW HIS NAME IS HEATH.  I DON'T KNOW HIS LAST NAME

8    IS FLANAGAN.

9    **Q.**   YOU GOT IT FROM HIM?

10   **A.**   YES.  I PURCHASED IT FROM HIM.

11   **Q.**   THAT'S THE SAME WEAPON THAT WAS USED IN THE BANK

12   ROBBERY?

13   **A.**   YES.

14   **Q.**   AND YOU INITIALLY WOULDN'T GIVE ANY NAMES ABOUT

15   ANYTHING TO THE AGENT ABOUT THAT, DID YOU?

16   **A.**   NO.

17   **Q.**   AND THAT LAST INSTANCE YOU WERE TALKING ABOUT, ERVIN

18   RODRIGUEZ OR VASQUEZ, WHATEVER HIS NAME IS?

19   **A.**   VASQUEZ, YES.

20   **Q.**   MR. NUNEZ WAS NOT EVEN AROUND WAKE COUNTY AT THAT

21   TIME, WAS HE?

22   **A.**   NO.

23   **Q.**   IN FACT, HE HAS BEEN IN GRANVILLE COUNTY SINCE

24   JANUARY OR FEBRUARY?

25   **A.**   I KNOW HE HAS BEEN IN GRANVILLE COUNTY.  I THINK HE

1  WAS IN GRANVILLE COUNTY BEFORE HE ACTUALLY CAME TO WAKE

2  COUNTY.  HE WAS IN FRANKLIN COUNTY.

3  **Q.**  ARE YOU A BLACK BELT IN MARSHAL ARTS?

4  **A.**  GINSU.

5  **Q.**  SO YOU ARE SAYING VASQUEZ ASSAULTED YOU WITH A

6  TOOTHBRUSH?

7  **A.**  SHARPENED TOOTHBRUSH.

8  **Q.**  BUT YOU WERE ABLE TO TAKE CARE OF YOURSELF, CORRECT?

9  **A.**  YES.

10 **Q.**  YOU DIDN'T REPORT THIS TO ANYBODY AT THE WAKE COUNTY

11 JAIL, DID YOU?

12 **A.**  NO.

13 **Q.**  IT WAS ONLY AS YOU GOT CLOSER TO YOUR OWN SENTENCING

14 THAT YOU DECIDED TO MAKE THIS KNOWN?

15 **A.**  NO.  I MADE IT KNOWN THE SECOND DAY, SOON AS I SEEN

16 KYLE YORK.

17      **MR. ASHTON:**  THAT'S ALL THE QUESTIONS I HAVE.

18      **MR. ONTJES:**  BRIEFLY, IF I MAY.

19              **REDIRECT EXAMINATION**

20 **BY MR. ONTJES:**

21 **Q.**  MR. ALLEN, YOU SIGNED AND GAVE YOUR ADDRESS ON THIS

22 LETTER THAT YOU WROTE TO PATTY, DIDN'T YOU?

23 **A.**  YEAH.

24 **Q.**  YOU WEREN'T TRYING TO CONCEAL YOUR IDENTITY OR

25 ANYTHING WHEN YOU SENT THIS LETTER, WERE YOU?

1    **A.**   NO.

2            **MR. ONTJES:**  NOTHING FURTHER.

3            **THE COURT:**  THANK YOU, MR. ALLEN.  THAT'S ALL

4    FOR MR. ALLEN.

5            **MR. ONTJES:**  THAT WOULD BE THE GOVERNMENT'S

6    EVIDENCE AS TO THE OBSTRUCTION.

7            **THE COURT:**  AND ACCEPTANCE.  I THINK THAT

8    THEY'RE COMBINED.

9            **MR. ONTJES:**  YES, SIR.

10           **THE COURT:**  MR. ASHTON, DID YOU WANT TO PUT ON

11   ANY EVIDENCE BEYOND THE CROSS-EXAMINATION?  I HEARD THE

12   ARGUMENTS.  ANYTHING ELSE FROM THE DEFENSE ON THOSE

13   OBJECTIONS?

14           **MR. ASHTON:**  NO EVIDENCE.  I'D LIKE TO BE HEARD

15   AT THE APPROPRIATE TIME.

16           **THE COURT:**  I'LL HEAR YOU RIGHT NOW.

17           **MR. ASHTON:**  THANK YOU, YOUR HONOR.  YOUR HONOR,

18   I KNOW THE CREDIBILITY ISSUE OF WITNESSES IS UP TO THE

19   COURT TO DECIDE.  I THOUGHT IT WOULD BE APPROPRIATE TO

20   HAVE YOU HEAR FROM MR. ALLEN.  MAYBE NOT, BUT I THOUGHT IN

21   THE BEST INTEREST OF MY CLIENT, I THOUGHT YOU AT LEAST

22   NEEDED TO TEST HIS CREDIBILITY.

23      I'M NOT A HANDWRITING EXPERT.  I DON'T KNOW

24   HANDWRITING ANALYSIS HERE, BUT I DID POINT OUT CERTAIN

25   THINGS OF THESE -- THE LETTER AND THE WRITING OF THOSE

1   NAMES AS TO WHO MAY HAVE PRINTED THEM.  I CERTAINLY THINK

2   A LOT OF THE CAPITAL LETTERS, THE DOUBLE L'S, THE P'S, NC

3   ARE VERY SIMILAR.

4       MR. NUNEZ IS NOT DENYING THAT HE DID NOT MEET WITH

5   MR. -- TALK WITH MR. ALLEN ABOUT SOME OF THESE THINGS, AND

6   THERE IS SOME INFORMATION THERE, BUT IF MR. ALLEN IS NOT

7   BEING TRUTHFUL ABOUT WHO WROTE SOME OF THAT DOWN, I DON'T

8   KNOW IF HE CAN BE BELIEVED.

9       HE ALSO IS VERY AWARE OF SUBSTANTIAL --

10          **THE COURT:**  WHAT'S YOUR THEORY ABOUT HOW

11  MR. ALLEN GOT THESE PICTURES?  WHERE WOULD MR. ALLEN GET

12  THE INFORMATION, SOCIAL SECURITY NUMBERS, DATE OF BIRTH,

13  AGE, PHONE NUMBERS, PICTURES?  DO YOU HAVE A THEORY ON

14  THAT, OR IS YOUR THEORY THAT HE WROTE SOME OF THE LETTERS

15  ON HERE AND SOMEONE ELSE WROTE THE REST, OR HE WROTE IT

16  ALL?  WHAT IS THE THEORY?  IS THERE ONE, ON EXHIBIT 1?

17          **MR. ASHTON:**  I THINK THE THEORY, AS I KNOW IT,

18  IS I THINK MR. NUNEZ ADMITTED TO MR. YORK THAT THEY HAD

19  TALKED ABOUT THIS.  IT'S MY UNDERSTANDING THAT MR. ALLEN

20  WROTE SOME OF THIS INFORMATION.  I THINK MR. ONTJES WAS

21  CORRECT IN THAT THERE'S DISCOVERY UP THERE IN THE CELL.

22  NOW WHETHER MR. NUNEZ GAVE IT TO MR. ALLEN, MR. ALLEN GOT

23  IT SOMEWHERE ELSE, IT OBVIOUSLY COMES FROM DISCOVERY.

24          **THE COURT:**  SO YOUR THEORY IS THAT MR. ALLEN

25  DIDN'T WRITE ALL OF EXHIBIT 1, HE WROTE SOME OF IT?

1    **MR. ASHTON:**  YES.  BUT THE IMPORTANT --

2         **THE COURT:**  WHAT DO YOU THINK HE DIDN'T WRITE?

3    THAT'S KIND OF STRANGE AS A THEORY, BUT I'M CURIOUS.  WHAT

4    DO YOU THINK HE DIDN'T WRITE?

5         **MR. ASHTON:**  WELL, WHAT I'M GETTING AT IS THE

6    CREDIBILITY OF MR. ALLEN, IF HE WROTE ANY OF IT, HE'S NOT

7    TOLD THE TRUTH HERE TODAY.

8         **THE COURT:**  OKAY.

9         **MR. ASHTON:**  SECONDLY, IF YOU READ -- AND YOU

10   READ HIS LETTER, HE'S VERY AWARE OF THE FEDERAL SYSTEM.  I

11   THINK IT SAYS, THE FEDS WORKS, YOU SHOULD KNOW I CAN GET A

12   TIME CUT FOR MY TESTIMONY.  SO IN WRITING THIS MISS BAKER,

13   OBVIOUSLY MR. ALLEN KNOWS HOW THE SYSTEM WORKS.  HE'S

14   TRYING TO WORK THE SYSTEM.  WE WOULD CERTAINLY CONTEND

15   THIS LATEST INCIDENT THAT I FOUND OUT ABOUT THIS MORNING,

16   WHICH WAS NEVER REPORTED.  I DON'T KNOW IF IT REALLY

17   HAPPENED OR NOT, BUT MR. ALLEN WRITES THAT AFTER

18   APPARENTLY MAYBE NOT GETTING A SUBSTANTIAL ASSISTANCE

19   MOTION OR TRYING TO GET A RULE 35 OR WHATEVER HE'S TRYING

20   TO DO.  SO WE WOULD CERTAINLY ARGUE THAT HIS TESTIMONY IS

21   NOT COMPLETELY CREDIBLE.

22        THE OTHER ARGUMENT I WOULD MAKE THOUGH, IS THAT

23   THE -- EVEN IF YOU BELIEVE MR. ALLEN, THIS WAS A STATEMENT

24   TO A THIRD PARTY.  IT WAS NEVER PASSED ONTO ANYBODY BUT

25   HIS LAWYER, SO HE COULD PROBABLY GET SOME HOPEFULLY

1    SUBSTANTIAL ASSISTANCE.  IT WAS NEVER PASSED ONTO

2    MR. JONES OR MORGAN.  NO ACTION WAS EVER TAKEN WHATSOEVER,

3    AND THE ONLY CASE I COULD FIND IN THIS CIRCUIT THAT EVEN

4    SORT OF SPEAKS TO THIS IS THE *UNITED STATES VERSUS BROOKS*,

5    WHICH IS A 1992 CASE.

6           **THE COURT:**  957 F.2D 1138.  I READ IT.  HOW DO

7    YOU THINK THAT CASE HELPS YOU?

8           **MR. ASHTON:**  I THINK IT HELPS ME BECAUSE THEY,

9    IN THAT PARTICULAR CASE, APPARENTLY THERE WAS A VEIL

10   THREAT TO A DEPUTY MARSHAL THAT NEVER WAS PASSED ONTO THE

11   ALLEGED TARGET.  THE 4TH CIRCUIT FOUND BASICALLY, WE DO

12   NOT BELIEVE THAT THE COMMENT AS TO WHICH THE DEPUTY

13   TESTIFIED STANDING ALONE COULD SUPPORT AN ENHANCEMENT FOR

14   OBSTRUCTION OF JUSTICE UNDER SECTION 3C1.1.

15           NOW, SECTION 3C1.1 REQUIRES THE DEFENDANT EITHER

16   THREATEN THE CO-DEFENDANT, WITNESS, OR JUROR IN HIS OR HER

17   PRESENCE, OR ISSUE A THREAT AND CIRCUMSTANCES IN WHICH

18   THERE'S SOME LIKELIHOOD THAT THE CO-DEFENDANT, WITNESS, OR

19   JUROR WILL LEARN OF THE THREAT.  NOT ONLY IS THERE NO

20   EVIDENCE IN THIS RECORD THAT PATTERSON EVER LEARNED OF

21   BROOKS' THREAT, THERE'S NO BASIS FROM CONCLUDING FROM THE

22   CIRCUMSTANCES IN WHICH THE THREAT WAS MADE THAT PATTERSON

23   MIGHT LEARN OF THE THREAT.  IT'S NOT EVEN CLEAR THAT

24   BROOKS ACTUALLY EVEN INTENDED THAT PATTERSON LEARN OF THE

25   THREAT.

1    **THE COURT:** BUT ISN'T THERE A DIFFERENCE IN

2  OBSTRUCTION? THERE'S OBSTRUCTION WHERE IT'S, IF YOU

3  COOPERATE I'M GOING TO KILL YOU VERSUS I WANT THESE PEOPLE

4  DEAD. RIGHT? AREN'T THOSE TWO DIFFERENT CONCEPTUALLY,

5  LEGALLY DIFFERENT THINGS IN APPLYING THIS ENHANCEMENT AND

6  ISN'T *BROOKS* DEALING WITH A SITUATION WHERE THE THEORY OF

7  THE OBSTRUCTION WAS, I WANT THESE WITNESSES TO KNOW I HAVE

8  THE ABILITY TO GET THEM KILLED, THEY BETTER SHUT UP. AS

9  DISTINCT FROM THE EVIDENCE, IF BELIEVED, HERE IS, I WANT

10  THESE PEOPLE DEAD. THIS ISN'T, GO THREATEN THEM. IT'S,

11  KILL THEM. 20 GRAND ON THIS HEAD, 20 GRAND ON THIS HEAD,

12  30 GRAND ON THIS HEAD. ISN'T *BROOKS* JUST COMPLETELY

13  DISTINGUISHABLE ON THAT BASIS, DON'T YOU THINK?

14    **MR. ASHTON:** WELL, NOT REALLY, YOUR HONOR,

15  BECAUSE, I MEAN, BASICALLY IN OUR CASE THESE PEOPLE WERE

16  NOT COMING IN TO TESTIFY. THEY ALL PLED GUILTY. IT WAS

17  SORT OF OVER. AS I SAID BEFORE, I THINK JUST A LOT OF

18  TALK BETWEEN PEOPLE AND LEWIS ALLEN DECIDED TO SEE IF HE

19  COULD HELP HIMSELF WITH IT.

20    **THE COURT:** OKAY.

21    **MR. ASHTON:** SO WE ARE -- I'M JUST ARGUING WHAT

22  I CAN ARGUE.

23    **THE COURT:** I'M JUST TRYING TO UNDERSTAND THE

24  THEORY, THAT'S ALL, BECAUSE I HAVE READ *BROOKS* AND I

25  UNDERSTAND WHAT *BROOKS* IS.

1          **MR. ASHTON:**  I BELIEVE HE ACTUALLY HAD A DIRECT

2     THREAT THAT THEY DIDN'T PRESENT, SO WHEN THEY REMANDED IT,

3     MR. BROOKS PROBABLY ENDED UP WITH THE ENHANCEMENT LATER

4     ANYWAY.

5          **THE COURT:**  AT LEAST -- CORRECT ME IF I'M WRONG,

6     IN *BROOKS* YOU ALSO DON'T HAVE AGENTS ACTUALLY INTERVIEWING

7     THAT DEFENDANT AND HIM ADMITTING TO THE SUBSTANCE OF THE

8     CONVERSATION EITHER, RIGHT?  YOU DIDN'T HAVE -- THAT

9     WASN'T PRESENT IN *BROOKS*.

10          **MR. ASHTON:**  RIGHT.  I AGREE.  THAT'S MY

11     PRESENTATION ON THIS.  AND THEN, OF COURSE, ACCEPTANCE OF

12     RESPONSIBILITY.  I UNDERSTAND THERE'S AN APPLICATION NOTE

13     THAT BASICALLY INDICATES THAT IF YOU HAVE OBSTRUCTION YOU

14     CAN'T GET AN ACCEPTANCE EXCEPT UNDER EXTRAORDINARY

15     CIRCUMSTANCES.  BUT WE WOULD CERTAINLY ARGUE HERE THAT MR.

16     NUNEZ STILL SHOULD GET HIS ACCEPTANCE OF RESPONSIBILITY.

17          OF COURSE, THERE ARE OBVIOUSLY NO CASES EXACTLY LIKE

18     THIS ONE EITHER, BUT HE DID PLEAD GUILTY PRE-INDICTMENT BY

19     AN INFORMATION, AS A MATTER OF FACT.  HE DID SIGN A PLEA

20     AGREEMENT.  HE HAS BEEN DEBRIEFED SEVERAL TIMES.  HE

21     ACCEPTED RESPONSIBILITY IN THE PLEA AGREEMENT.  HE

22     ACCEPTED RESPONSIBILITY TO THE PROBATION OFFICER WHEN HE

23     INTERVIEWED WITH HIM, AND I WOULD JUST ARGUE THIS MIGHT BE

24     THE TYPE OF CASE, IF YOU DO FIND OBSTRUCTION, THAT YOU CAN

25     STILL FIND THE ACCEPTANCE AND THAT WOULD BE A PROPER LEGAL

1   DETERMINATION.

2           **THE COURT:**  THANK YOU, MR. ASHTON.  I'LL HEAR

3   FROM MR. ONTJES.

4           **MR. ONTJES:**  YOUR HONOR, I WOULD ASK THE COURT

5   TO APPLY THE OBSTRUCTION AS WELL AS TAKING AWAY THIS

6   DEFENDANT'S ACCEPTANCE OF RESPONSIBILITY.  UNDER 3C1.1,

7   APPLICATION NOTE 4A, NOT ONLY IS THE OBSTRUCTION

8   APPLICABLE WHERE A DEFENDANT THREATENS OR INTIMIDATES A

9   WITNESS, AS THE CASE HERE, BUT ATTEMPTS TO DO SO.  I'M

10  READING THAT AT PAGE 348.

11          IN THIS CASE, YOUR HONOR, AS MR. ALLEN TESTIFIED AND

12  AS AGENT YORK TESTIFIED, THIS DEFENDANT ADMITTED TO

13  ATTEMPTING TO HAVE THESE WITNESSES KILLED.  I WOULD SUBMIT

14  THE PURPOSE OR MOTIVE IS BECAUSE HE BELIEVED THESE

15  INDIVIDUALS WERE GOING TO SIGNIFICANTLY INCREASE HIS DRUG

16  AMOUNT THAT WOULD ADVERSELY AFFECT HIS SENTENCING.

17          **THE COURT:**  AND IN MAKING THIS ARGUMENT,

18  MR. ONTJES, IT IS THE POSITION OF THE UNITED STATES THAT

19  PURSUANT TO THE CLAUSE IN PARAGRAPH FIVE OF THE PLEA

20  AGREEMENT, THAT THE DEFENDANT'S CONDUCT PRIOR TO

21  SENTENCING CHANGED THE CIRCUMSTANCES WITH RESPECT TO THE

22  GOVERNMENT'S AGREEMENT TO MAKE A RECOMMENDATION AT

23  SENTENCING FOR A THREE LEVEL DOWNWARD ADJUSTMENT, RIGHT?

24          SO YOU TAKE THE POSITION THAT RIGHT NOW YOU ARE

25  ACTING COMPLETELY IN CONFORMITY WITH IT BECAUSE ALL OF

1   THESE EVENTS TOOK PLACE AFTER THE 22 AUGUST 2008, PLEA

2   AGREEMENT THAT WAS FILED ON SEPTEMBER 4, 2008, CORRECT?

3           **MR. ONTJES:**  YES, SIR.  AND THANK YOU FOR

4   BRINGING THAT TO MY ATTENTION.  I WOULD ASK THE COURT, AND

5   I THINK THE COURT HAS ALREADY DONE THIS, TO MAKE A FINDING

6   THAT IN FACT THE CIRCUMSTANCES HAD CHANGED.

7           **THE COURT:**  THE COURT DOES SO FIND.

8           **MR. ONTJES:**  THANK YOU, YOUR HONOR.  I WOULD ASK

9   THE COURT TO APPLY THE TWO-LEVEL ENHANCEMENT FOR

10  OBSTRUCTION.  THE DEFENDANT'S OWN ADMISSION ITSELF, I

11  THINK CONSTITUTES BY A PREPONDERANCE OF THE EVIDENCE THAT

12  HE IN FACT DID ATTEMPT TO HAVE THESE WITNESSES KILLED.  I

13  BELIEVE, AS THE COURT HAS ALREADY INDICATED, THAT SORT OF

14  GOES HAND-IN-HAND WITH HIS LOSS OF ACCEPTANCE OF

15  RESPONSIBILITY.

16      I WOULD SUBMIT, YOUR HONOR, YOU HAVE TWO GROUNDS IN

17  WHICH THE COURT CAN TAKE AWAY HIS ACCEPTANCE.  NOT ONLY

18  ONE, THE THREAT TO THE WITNESSES; BUT TWO, THE CONTINUING,

19  ONGOING INTENT TO CONTINUE THE DRUG OPERATIONS.  THIS

20  DEFENDANT, WHO IN A CONVERSATION WITH MR. ALLEN TRIED TO

21  SOLICIT MR. ALLEN IN HIS TRUCKING BUSINESS THROUGH HIS

22  FAMILY MEMBERS, TO CONTINUE, I THINK IN HIS WORDS, TO

23  CONTINUE ROLLING.  THAT ONCE MR. ALLEN WAS GOING TO GET

24  OUT, THAT HE WAS GOING TO CONTACT MR. NUNEZ AS THE

25  DEFENDANT'S SOURCE IN CALIFORNIA AND THEY WOULD PICK UP

1  WHERE THEY LEFT OFF AND CONTINUE TO TRANSPORT AND

2  DISTRIBUTE LARGE AMOUNTS OF MARIJUANA AS WELL AS COCAINE

3  THROUGHOUT THE UNITED STATES.

4      SO FOR BOTH OF THOSE REASONS, YOUR HONOR, AS THE

5  COURT IS AWARE UNDER 3D1.1, APPLICATION NOTE 1B, I WOULD

6  SUBMIT THIS DEFENDANT HAS NOT DONE THAT, BY HIS CONTINUED

7  EFFORTS TO SOLICIT MR. ALLEN TO CONTINUE WITH HIS DRUG

8  TRADE.  BUT YOU ALSO, OF COURSE, UNDER APPLICATION NOTE

9  FOUR, I THINK AS MR. ASHTON ALREADY INDICATED, WHERE YOU

10  FIND OBSTRUCTION UNLESS THERE ARE EXTRAORDINARY

11  CIRCUMSTANCES, AND I WOULD SUBMIT TO THE COURT THERE ARE

12  NO EXTRAORDINARY CIRCUMSTANCES HERE.  IF THE COURT FINDS

13  OBSTRUCTION, THEN NATURALLY THE ACCEPTANCE WOULD ALSO BE

14  REMOVED.  I WOULD ASK THE COURT TO SO DO.  THANK YOU.

15          **THE COURT:**  THANK YOU.  ALL RIGHT.  UNDER

16  SENTENCING GUIDELINE SECTION 3C1.1, "IF THE DEFENDANT

17  WILLFULLY OBSTRUCTED OR IMPEDED OR ATTEMPTED TO OBSTRUCT

18  OR IMPEDE THE ADMINISTRATION OF JUSTICE WITH RESPECT TO

19  THE INVESTIGATION, PROSECUTION, OR SENTENCING OF THE

20  INSTANT OFFENSE OF CONVICTION, AND THE OBSTRUCTIVE CONDUCT

21  RELATED TO THE DEFENDANT'S OFFENSE OF CONVICTION, AND ANY

22  RELEVANT CONDUCT OR CLOSELY-RELATED OFFENSE, INCREASE THE

23  OFFENSE LEVEL BY TWO LEVELS."

24      THE COURT HAS CONSIDERED THE EVIDENCE PRESENTED AT

25  THIS HEARING.  THE COURT FOUND AGENT YORK TO BE A VERY

CREDIBLE WITNESS IN DESCRIBING THE DRUG ORGANIZATION.  THE

COURT ALSO NOTES IT IS DESCRIBED IN THE PRESENTENCE

REPORT.  THE ORGANIZATION INVOLVED JONES, AND PHILLIP

MORGAN AND JIMMY BROGDEN.  IT ALSO INCLUDED THE DEFENDANT,

MR. NUNEZ.

THE COURT HAS RECEIVED AND REVIEWED GOVERNMENT'S

EXHIBITS 1 AND 2.  THE COURT CREDITS AGENT YORK'S

TESTIMONY ABOUT HIS INTERVIEW OF MR. NUNEZ TO KILL DAVID

MICHAEL JONES, PHILLIP MORGAN, AND JIMMY BROGDEN.  THE

COURT ALSO CREDITS THE TESTIMONY OF MR. LEWIS ALLEN.  THE

COURT CREDITS THAT TESTIMONY WITH RESPECT TO THE

CONVERSATION THAT HE HAD WITH MR. NUNEZ ABOUT THESE THREE

CO-DEFENDANTS.

THE COURT FINDS THAT MR. ALLEN DID NOT WRITE

GOVERNMENT'S EXHIBIT NO. 1, HE DID NOT WRITE ANY OF

GOVERNMENT'S EXHIBIT NO. 1.  GOVERNMENT'S EXHIBIT 1 IS

VERY DETAILED WITH PICTURES OF TWO OF THREE CO-DEFENDANTS,

SOCIAL SECURITY NUMBERS OF TWO OF THREE CO-DEFENDANTS,

PHONE NUMBERS, BIRTH DATES, ALL CONSISTENT WITH THE

TESTIMONY OF AGENT YORK CONCERNING INFORMATION SET FORTH

ON STATE COURT ARREST WARRANT DOCUMENTATION, INCLUDING

PHOTOGRAPHS.

DAVID MICHAEL JONES WAS NOT ARRESTED AT THE SAME TIME

AS MR. NUNEZ, AND HIS PICTURE IS NOT ON THIS PIECE OF

PAPER, WHICH IS FURTHER CORROBORATIVE OF THIS COURT'S

1  FINDING THAT IN FACT MR. NUNEZ PREPARED THIS GOVERNMENT'S

2  EXHIBIT 1.

3      THE COURT FINDS THAT THE DEFENDANT WILLFULLY

4  OBSTRUCTED OR IMPEDED OR ATTEMPTED TO OBSTRUCT OR IMPEDE

5  THE ADMINISTRATION OF JUSTICE WITH RESPECT, AT A MINIMUM,

6  TO THE SENTENCING OF THE INSTANT OFFENSE OF CONVICTION,

7  EVEN IF ONE ASSUMES THAT IN MR. NUNEZ'S MIND HE BELIEVED

8  THAT MR. JONES OR THESE OTHER CO-DEFENDANTS WERE

9  ATTRIBUTING DRUG WEIGHT OR OTHER CRIMINAL CONDUCT TO HIM.

10     THE COURT BELIEVES THAT MR. -- AND BELIEVES AND FINDS

11  THAT MR. NUNEZ WILLFULLY OBSTRUCTED OR IMPEDED OR

12  ATTEMPTED TO OBSTRUCT OR IMPEDE THE ADMINISTRATION OF

13  JUSTICE WITH RESPECT TO HIS SENTENCING FOR THE INSTANT

14  OFFENSE OF CONVICTION, AND THAT THE OBSTRUCTIVE CONDUCT

15  RELATED TO HIS OFFENSE OF CONVICTION AND ANY RELEVANT

16  CONDUCT OR CLOSELY RELATED CONDUCT.

17     THE COURT HAS REVIEWED AND CONSIDERED THE ARGUMENTS

18  OF COUNSEL, IN PARTICULAR THE DISCUSSION OF *UNITED STATES*

19  *V. BROOKS*.  AGAIN, THE COURT THINKS THAT *BROOKS* DOES NOT

20  ASSIST THE DEFENDANT IN CONNECTION WITH THIS ARGUMENT.

21  THE COURT FINDS THAT THE DEFENDANT DID CONSCIOUSLY ACT

22  WITH THE PURPOSE OF OBSTRUCTING JUSTICE.

23     IN *UNITED STATES V. SELF*, 132 F.3D 1039, (4TH CIRCUIT

24  1997), THE 4TH CIRCUIT STATED, "ATTEMPTING TO HAVE A

25  WITNESS KILLED EASILY FALLS WITHIN THE TYPE OF CONDUCT

THAT CONSTITUTES AN OBSTRUCTION OF JUSTICE." CERTAINLY

THE THREE TARGETS OF THIS PLOT THAT MR. NUNEZ INITIATED

WERE CONNECTED TO HIS CASE AND TO HIS SENTENCING, AND HE

ENGAGED IN THIS CONDUCT WITH THE INTENT TO OBSTRUCT

JUSTICE. THE COURT ALSO BELIEVES THAT MR. NUNEZ'S CONDUCT

FALLS COMFORTABLY WITHIN THE CONFINES OF THE COVERED

CONDUCT DESCRIBED IN APPLICATION NOTE FOUR OF SECTION

3C1.1.

AS FOR THE OBJECTION CONCERNING ACCEPTANCE OF

RESPONSIBILITY UNDER SECTION 3B1.1, THE TEXT OF THAT

GUIDELINE PROVISION REQUIRES THAT A DEFENDANT CLEARLY

DEMONSTRATE ACCEPTANCE OF RESPONSIBILITY.

APPLICATION NOTE FIVE NOTES THAT A SENTENCING JUDGE

IS IN A UNIQUE POSITION TO EVALUATE A DEFENDANT'S

ACCEPTANCE OF RESPONSIBILITY.

APPLICATION NOTE FOUR STATES, "CONDUCT RESULTING IN

AN ENHANCEMENT UNDER SECTION 3C1.1, OBSTRUCTING OR

IMPEDING THE ADMINISTRATION OF JUSTICE ORDINARILY

INDICATES THAT THE DEFENDANT HAS NOT ACCEPTED

RESPONSIBILITY FOR HIS CRIMINAL CONDUCT. THERE MAY

HOWEVER BE EXTRAORDINARY CASES IN WHICH ADJUSTMENTS UNDER

SECTIONS 3C1.1 AND 3B1.1 MAY APPLY." THE COURT FINDS THIS

IS NOT SUCH AN EXTRAORDINARY CASE.

THE COURT FINDS THAT MR. NUNEZ'S OBSTRUCTION OF

JUSTICE IN CONNECTION WITH HIS COMMUNICATION REFLECTED IN

1  GOVERNMENT'S EXHIBIT NO. 1, AND HIS DESIRE TO HAVE THOSE

2  THREE CO-DEFENDANTS MURDERED SPEAKS AN ABJECT LACK OF

3  ACCEPTANCE OF RESPONSIBILITY.  THE COURT ALSO AND

4  ALTERNATIVELY FINDS THAT MR. NUNEZ DID NOT CLEARLY ACCEPT

5  RESPONSIBILITY BASED UPON HIS CONVERSATION WITH MR. ALLEN,

6  ONCE MR. NUNEZ LEARNED THAT MR. ALLEN'S FIANCEE'S RELATIVE

7  HAD A TRUCKING BUSINESS THAT COULD BE USED TO TRANSPORT

8  DRUGS.  THAT FURTHER SPEAKS TO THE LACK OF ACCEPTANCE OF

9  RESPONSIBILITY IN THIS CASE.

10      HAVING FULLY CONSIDERED THE ARGUMENTS ASSOCIATED WITH

11  THE OBSTRUCTION OF JUSTICE ENHANCEMENT AND THE ABSENCE OF

12  ACCEPTANCE OF RESPONSIBILITY, THOSE OBJECTIONS ARE

13  OVERRULED.

14      ARE THERE ANY OTHER OBJECTIONS, MR. ASHTON?

15          **MR. ASHTON:**  NO, YOUR HONOR.

16          **THE COURT:**  ANY OBJECTIONS FROM THE GOVERNMENT?

17          **MR. ONTJES:**  NO, YOUR HONOR.

18          **THE COURT:**  ALL RIGHT.  THE TOTAL OFFENSE LEVEL,

19  FOR PURPOSES OF *BOOKER* AND ITS PROGENY, IS 36.  THE

20  CRIMINAL HISTORY CATEGORY IS V.  THE ADVISORY GUIDELINE

21  RANGE IS 292 TO 365-MONTHS.

22      DOES THE GOVERNMENT OBJECT TO THAT ADVISORY GUIDELINE

23  DETERMINATION?

24          **MR. ONTJES:**  IT DOES NOT, YOUR HONOR.

25          **THE COURT:**  AND WITH YOUR OBJECTIONS PRESERVED,

1  TO THE POINT YOU OBJECTED TO, MR. ASHTON, JUST AS TO THE

2  CALCULATION, DO YOU OBJECT TO THAT CALCULATION OF THE

3  ADVISORY GUIDELINE RANGE?

4          **MR. ASHTON:**  I STILL HAVE A DEPARTURE ISSUE, BUT

5  AT THIS POINT I AGREE THAT IS CORRECT.

6          **THE COURT:**  OKAY.  WELL, LET'S TAKE A RECESS

7  UNTIL 1:45 P.M. AND THEN WE'LL TAKE UP THE DEPARTURE

8  MOTION THAT THE DEFENSE FILED.  THERE'S NO MOTION FROM THE

9  GOVERNMENT IN THIS CASE THAT'S REFLECTED IN THE PAPERS.

10         **MR. ONTJES:**  NO, YOUR HONOR.

11         **THE COURT:**  WE'LL TAKE UP THE DEFENSE MOTION AT

12  1:45 P.M. AND THEN WE'LL CONTINUE WITH THE 3553(A)

13  FACTORS.

14         **MR. ASHTON:**  I BELIEVE I HAVE A VARIANCE MOTION

15  TOO.  THEY SHOULD BE FAIRLY QUICK.

16         **THE COURT:**  RIGHT.  THE COURT WILL BE IN RECESS

17  UNTIL 1:45 P.M.

18     (LUNCH RECESS TAKEN.)

19         **THE COURT:**  ALL RIGHT.  AT THIS TIME THE COURT

20  WILL RECOGNIZE MR. ASHTON TO SPEAK TO HIS MOTION FOR A

21  DEPARTURE.

22         **MR. ASHTON:**  THANK YOU, YOUR HONOR.  THE MOTION

23  FOR DEPARTURE IS UNDER GUIDELINE SECTION 4A1.3, WHICH IS

24  BASICALLY WE'RE CONTENDING THAT THE CRIMINAL HISTORY

25  CATEGORY SUBSTANTIALLY OVERREPRESENTS THE SERIOUSNESS OF

1  THE DEFENDANT'S PAST CONDUCT OR THE LIKELIHOOD HE WILL

2  COMMIT OTHER CRIMES.

3      I'VE SEEN RECORDS A LOT LONGER IN FEDERAL COURT THAN

4  THIS ONE, AND AT LESS THAN TEN POINTS.  MR. NUNEZ HAS

5  ENDED UP WITH TEN POINTS, I BELIEVE WHICH MADE HIM A

6  CATEGORY V.  ONE OF THEM WAS FOR A DRIVING OFFENSE AND

7  THAT GAVE HIM HIS FOUR POINTS, AND BASICALLY THE LAST SIX

8  POINTS ARISE OUT OF THE POSSESSION OF A FIREARM BY FELON

9  CHARGE.  HE GOT THREE POINTS FOR THAT.  WHEN THIS

10 OCCURRED, HE WAS ON PAROLE AND HE HAD GOTTEN OUT OF PRISON

11 LESS THAN TWO YEARS BEFORE.  ALL OF A SUDDEN HE ENDED UP

12 WITH SIX POINTS FOR BASICALLY THAT ONE SERIES OF EVENTS.

13     SO WE THINK THIS CATEGORY DOES IN FACT OVERREPRESENT

14 HIS PAST CONDUCT.

15         **THE COURT:**  NOW, UNDER 4A1.1, HE DOESN'T GET ANY

16 POINTS FOR ABSCONDING, RIGHT, AS REFLECTED AT THE END OF

17 PARAGRAPH 14, RIGHT?  YOU SAID ESSENTIALLY FOR THESE

18 SERIES OF EVENTS HE GOT SIX.  HE GOT THREE FOR THE

19 POSSESSION OF A FIREARM BY A FELON CONVICTION, RIGHT?  AND

20 THEN HE'S ON PAROLE AS OF MARCH 15, 2006, AND HE GETS TWO

21 POINTS FOR THAT, RIGHT?

22         **MR. ASHTON:**  CORRECT.

23         **THE COURT:**  TELL ME WHERE -- YOU SAID THAT THOSE

24 SERIES OF EVENTS YIELDED SIX, AND SO THE OTHER POINT IS

25 THE 4A1.1(E).  IS THAT WHAT YOU ARE SAYING?

1      **MR. ASHTON:** THE LAST POINT IS, HE HAD BEEN OUT,

2 I THINK, LESS THAN TWO YEARS. HE GOT A POINT FOR THAT.

3 WHAT I'M SAYING IS, WHEN YOU LOOK AT ALL OF THIS TOGETHER,

4 HIS RECORD IS NOT THAT BAD COMPARED TO MOST WHO COME IN

5 HERE. SOMEHOW HE JUST ENDED UP WITH TEN POINTS BASED ON A

6 RECORD, I WOULD SUBMIT, IS NOT AS SERIOUS AS TEN POINTS

7 WOULD NORMALLY ALLOW.

8      **THE COURT:** AND YOUR FOCUS WOULD BE ON THE

9 CONVICTION IN PARAGRAPH 14. THAT'S WHAT YOUR MAIN

10 CONTENTION IS. YOU THINK THAT'S WHAT REALLY DRIVES HIM TO

11 A FIVE, AND YOUR PAPERS SUGGEST HE SHOULD BE A THREE.

12 TELL ME HOW YOU GET FROM TEN TO SIX. I ASSUME BECAUSE YOU

13 ARGUE THAT THE COURT OUGHT TO GO DOWN TO CRIMINAL HISTORY

14 CATEGORY III, WHICH WOULD BE A FOUR, FIVE, OR SIX POINTS.

15      **MR. ASHTON:** THAT'S CORRECT. ALL I SUGGEST, I

16 JUST SORT OF PULLED THAT OUT OF THE AIR BASED ON

17 EXPERIENCE AND SEEING LOTS OF RECORDS THROUGH ALL OF THE

18 YEARS. I CERTAINLY THINK ONE POINT SHOULD, I THINK, GET

19 HIM DOWN. I'VE LOST MY CHART HERE NOW. ONE POINT WOULD

20 LOWER HIM TO CATEGORY IV.

21      OF COURSE, AS I SAY, ONE OF THESE IS A DRIVING

22 OFFENSE. I THINK THERE WAS SOME OVERLAPPAGE OF TIME. I

23 THINK WHEN HIS PROBATION WAS REVOKED ON THE FIRST CASE, I

24 THINK HE ENDED UP -- THIS POSSESSION OF FIREARM IMPACTED

25 REVOCATION ON ANOTHER ONE AS WELL AND, OF COURSE, HE PAID

1   HIS DUES ON ALL OF THOSE CASES.  THAT'S BASICALLY WHERE

2   WE'RE COMING FROM ON THE DEPARTURE.

3          **THE COURT:**  OKAY.  LET ME HEAR FROM MR. ONTJES.

4          **MR. ONTJES:**  THANK YOU, YOUR HONOR.  YOUR HONOR,

5   THE GOVERNMENT OPPOSES ANY TYPE OF DEPARTURE BASED ON HIS

6   CRIMINAL HISTORY.  I WOULD NOTE 4A1.3, APPLICATION NOTE

7   THREE, WHICH GIVES AN EXAMPLE OF WHEN PERHAPS A DOWNWARD

8   DEPARTURE IS APPROPRIATE.

9          THE EXAMPLE GIVEN IS THAT WHERE A DEFENDANT HAS TWO

10  MINOR MISDEMEANOR CONVICTIONS CLOSE TO TEN YEARS PRIOR TO

11  THE INSTANT OFFENSE.  HERE, AS THE COURT -- SPECIFICALLY

12  IN PARAGRAPH 14, A DEFENDANT WHO ATTEMPTS TO SELL TWO SKS

13  RIFLES, ONE AK-47 RIFLE, AND A .44 CALIBER REVOLVER TO AN

14  UNDERCOVER OFFICER IN 2005, LESS THAN THREE YEARS BEFORE

15  HE WAS INVOLVED IN THIS DRUG ORGANIZATION WHICH HE'S NOW

16  BEFORE THE COURT BEING SENTENCED.

17         SO THAT, I WOULD SUBMIT, IS A SIGNIFICANT -- HE PLED

18  OF COURSE TO POSSESSION OF A FIREARM BY A FELON.  I THINK

19  THE FACT IT WAS A SIGNIFICANT CHARGE, THAT FIREARMS

20  INVOLVED ARE ASSAULT RIFLES.  THAT, AGAIN, IT WAS RECENT

21  IN TIME TO THE OFFENSE THAT HE'S NOW BEFORE THE COURT, AND

22  THEREFORE WE DON'T BELIEVE -- THE UNITED STATES DOES NOT

23  BELIEVE THAT DEPARTURE IS WARRANTED HERE.  THANK YOU.

24         **THE COURT:**  THANK YOU.  THE COURT HAS CONSIDERED

25  THE MOTION FOR DEPARTURE UNDER SECTION 4A1.3.  SECTION

1   4A1.3(B)(1) STATES, "IF RELIABLE INFORMATION INDICATES

2   THAT THE DEFENDANT'S CRIMINAL HISTORY CATEGORY

3   SUBSTANTIALLY OVERREPRESENTS THE SERIOUSNESS OF THE

4   DEFENDANT'S CRIMINAL HISTORY OR THE LIKELIHOOD THAT THE

5   DEFENDANT WILL COMMIT OTHER CRIMES, A DOWNWARD DEPARTURE

6   MAY BE WARRANTED."

7       AS MR. ONTJES POINTED OUT, COMMENTARY IN APPLICATION

8   NOTE THREE GIVES AN EXAMPLE WHERE A DOWNWARD DEPARTURE MAY

9   BE WARRANTED.  THE EXAMPLE DESCRIBES THE DEFENDANT WHO HAS

10  HAD TWO MINOR MISDEMEANOR CONVICTIONS CLOSE TO TEN YEARS

11  PRIOR TO THE INSTANT OFFENSE, AND NO OTHER EVIDENCE OF

12  PRIOR CRIMINAL BEHAVIOR IN THE INTERVENING PERIOD.

13      THE COURT DOES NOT BELIEVE DOWNWARD DEPARTURE IS

14  APPROPRIATE IN THIS CASE.  THE COURT HAS REVIEWED THE

15  CRIMINAL HISTORY SET OUT AT PARAGRAPHS 11 THROUGH 15 AND

16  THE CRIMINAL HISTORY COMPUTATION AT PARAGRAPH 16 THROUGH

17  19.  THE COURT BELIEVES THE COMPUTATION IS CORRECT AND

18  CONSISTENT WITH THE GUIDELINE PROVISIONS.

19      MOREOVER, THE COURT BELIEVES THE DEFENDANT'S CRIMINAL

20  HISTORY IS FAR REMOVED IN SPACE AND TIME FROM THE EXAMPLE

21  GIVEN IN APPLICATION NOTE THREE.  THE DEFENDANT HAS BEEN

22  CONVICTED OF FELONY TERRORIST THREAT IN MARCH 2003.  HE

23  PLEADED GUILTY, SERVED A CUSTODIAL SENTENCE.  HE WAS

24  PLACED ON PROBATION.  NOTABLY HIS PROBATION WAS REVOKED.

25      PARAGRAPH 12, HE DID GET A DRIVING OFFENSE.  HE WAS

1  PLACED ON PROBATION.  THAT PROBATION WAS REVOKED.  ANOTHER

2  DRIVING OFFENSE IN PARAGRAPH 13.  HE WAS PLACED ON

3  PROBATION.  ALTHOUGH THAT WASN'T REVOKED, HE DID REOFFEND

4  WITHIN THE TWO-YEAR PERIOD WITH A POSSESSION OF A FIREARM

5  BY A FELON, RECEIVED A CUSTODIAL SENTENCE, WAS PAROLED,

6  ABSCONDED.

7        THE COURT DOES NOT BELIEVE CRIMINAL HISTORY CATEGORY

8  V SUBSTANTIALLY OVERREPRESENTS EITHER THE SERIOUSNESS OF

9  THE DEFENDANT'S PAST CRIMINAL CONDUCT OR THE LIKELIHOOD

10 THAT HE WILL COMMIT OTHER CRIMES.  SO THAT MOTION IS

11 DENIED.

12       THERE BEING NO STANDARD DEPARTURE MOTION FROM THE

13 GOVERNMENT, THE COURT WILL NOW CONSIDER THE DEFENSE

14 ARGUMENTS ASSOCIATED WITH THE 3553(A) FACTORS.  AS PART OF

15 THAT, I WILL HEAR FROM MR. ASHTON ABOUT THE 3553(A)

16 FACTORS, INCLUDING THE MOTION FOR A VARIANCE WHICH, OF

17 COURSE, ANY VARIANCE EITHER UP OR DOWN NEEDS TO BE TIED TO

18 THE 3553(A) FACTORS IN CONNECTION WITH THIS COURT MEETING

19 ITS OBLIGATION TO IMPOSE A SENTENCE SUFFICIENT BUT NOT

20 GREATER THAN NECESSARY TO COMPLY WITH THE PURPOSES SET

21 FORTH IN SECTION 3553(A).  SO THE COURT WILL RECOGNIZE MR.

22 ASHTON.

23            **MR. ASHTON:**  THANK YOU, YOUR HONOR.  AGAIN, ON

24 OUR VARIANCE MOTION, IN VIEW OF ALL THE OTHER RULINGS, MR.

25 NUNEZ HAS COME IN AT A CATEGORY LEVEL 36, CATEGORY V, AND

THAT WAS THEN DETERMINED TO BE 292 TO 365 MONTHS.  THIS
YOUNG MAN WILL BE 26 IN ABOUT TWO WEEKS, AND THAT IS WELL
INTO THE 20 TO 30-YEAR RANGE, AS IT IS.

I WOULD SUBMIT TO THE COURT, WHILE MARIJUANA IS
SERIOUS, IT'S CERTAINLY NOT AS SERIOUS A CRIME AS COCAINE
OR METH OR HEROIN, OR SOME OF THESE OTHER DRUGS THAT WE
DEAL WITH, AND YOU ARE PROBABLY NOT GOING TO SEE THIS LONG
A SENTENCE ON A MARIJUANA CASE.  UNFORTUNATELY, MR. NUNEZ
HAS GOT HIMSELF INTO THIS POSITION, BUT I WOULD SIMPLY
ARGUE TO THE COURT THAT THIS RANGE IS EVEN HARSH WHEN YOU
CONSIDER THE ORIGINAL CHARGE THAT HE HAD.

WE HAVE PROVIDED YOU WITH A NUMBER OF CHARACTER
LETTERS AND FAMILY LETTERS.

**THE COURT:**  THE COURT HAS REVIEWED THOSE LETTERS
AND THANK YOU FOR SUBMITTING THEM.

**MR. ASHTON:**  HE DOES HAVE VERY STRONG FAMILY
SUPPORT.  I BELIEVE HE NEEDS TO FURTHER HIS EDUCATION.
HE'S SOMEONE WHO SEEMED TO LOSE TRACK OF LIFE AFTER HIS
DAD DIED OF CANCER, AND APPARENTLY HE WAS ABLE, AT SOME
TIME, TO BE A DECENT STUDENT.  HE SEEMS TO HAVE THE
INTELLIGENCE TO, IF HE COULD, GO BACK AND GET SOME
EDUCATIONAL OPPORTUNITIES.

WE SUBMIT A SENTENCE LESS THAN THE GUIDELINE RANGE
WOULD STILL AVAIL MR. NUNEZ OF THE EDUCATIONAL
OPPORTUNITIES IN PRISON.  IT WOULD ALSO PROTECT THE

1 PUBLIC.  IT WOULD DETER OTHERS BECAUSE THE RANGE IS

2 SIGNIFICANT.  EVEN IF YOU DO SENTENCE HIM BELOW THE

3 SUGGESTED GUIDELINE RANGE, I WOULD CERTAINLY SUGGEST TO

4 THE COURT IT WOULD BE JUST PUNISHMENT, IT WOULD DETER

5 OTHERS, AND IT WOULD STILL PROMOTE RESPECT FOR THE LAW.

6     I CERTAINLY THINK THERE ARE A NUMBER OF SENTENCES

7 UNDER 292 WHICH WOULD STILL ACHIEVE ALL THE SENTENCING

8 FACTORS UNDER 3553.

9     DO YOU WANT ME TO CLOSE OUT EVERYTHING THAT YOU WANT

10 SAID AT THIS TIME?

11        **THE COURT:**  YES.  I'M GOING TO HEAR FROM MR.

12 NUNEZ AND THEN I'LL HEAR FROM MR. ONTJES.  AFTER

13 MR. ONTJES SPEAKS, IF THERE'S SOMETHING THAT YOU WANT TO

14 SAY, I'LL HEAR FROM YOU.

15        **MR. ASHTON:**  ALL RIGHT.  WELL, I THINK YOU

16 REVIEWED EVERYTHING, YOU HEARD EVERYTHING, AND I JUST

17 DON'T KNOW HOW SOMEONE LIKE THIS COULD END UP LOOKING AT A

18 SENTENCE LIKE HE DOES NOW.  SEEMS LIKE EVERY MOVE WAS MADE

19 WRONG.

20     THE FIRST THING I TELL A CLIENT IN JAIL IS, "KEEP

21 YOUR MOUTH SHUT AND YOUR EARS OPEN."  UNFORTUNATELY, FOR

22 WHATEVER REASON, HIS SENTENCE HAS SIGNIFICANTLY ESCALATED

23 SINCE HE PLED GUILTY AND TRIED TO DO THE RIGHT THING.

24        **THE COURT:**  WELL, HE DIDN'T QUITE ALWAYS TRY TO

25 DO THE RIGHT THING, RIGHT, IN LIGHT OF SOME OF THE COURT'S

1  PRIOR FINDINGS.  FAIR TO SAY THAT'S, AND I'LL SAY THAT

2  IT'S VERY TROUBLING, VERY TROUBLING TO THIS COURT.  I'M

3  LISTENING TO YOUR ARGUMENT ABOUT A VARIANCE AND I'M STILL

4  LISTENING, BUT I WANT YOU TO KNOW THAT I'M THINKING ABOUT

5  VARYING THE OTHER WAY BECAUSE I'M VERY TROUBLED BY THIS

6  TYPE OF CONDUCT THAT TOOK PLACE, VERY SPECIFIC, DETAILED

7  INFORMATION TO MURDER THREE PEOPLE.

8       I CAN SAY THAT I HAVE GIVEN OBSTRUCTION ENHANCEMENTS,

9  I HAVE TAKEN AWAY ACCEPTANCE OF RESPONSIBILITY.  THE

10  SUPREME COURT IN *BOOKER* AND ITS PROGENY HAS MADE CLEAR

11  THAT SENTENCING COURTS SEE A LOT MORE CASES THAN APPELLATE

12  COURTS WILL EVER SEE.  SEE PROBABLY MORE IN A YEAR THAN

13  THEY WILL SEE IN A DECADE.  AS PART OF THAT PROCESS, THIS

14  COURT, UNFORTUNATELY SOMETIMES, THANKFULLY NOT TOO OFTEN,

15  SEES OBSTRUCTION.  BUT THERE'S OBSTRUCTION AND THEN

16  THERE'S OBSTRUCTION, AND I THINK WE'RE IN THE LATTER

17  CATEGORY HERE.

18       SO I WANT YOU TO KNOW THAT, AND I WANT YOU TO KNOW

19  HOW TROUBLED I AM BY THIS DEFENDANT'S CONDUCT, NOT ONLY

20  FOR THAT PLOT BUT I CREDIT ALLEN'S TESTIMONY ABOUT THIS

21  DEFENDANT IN WHAT, IN THIS COURT'S VIEW, IS A CAVALIER

22  ATTITUDE TOWARD RECRUITING SOMEBODY TO JUST GET BACK INTO

23  THE DRUG BUSINESS WITH HIM.  SO GO AHEAD.

24            **MR. ASHTON:**  YOUR HONOR, I'M TROUBLED TOO.  AS

25  AN ATTORNEY WE TRY TO DO THE BEST WE CAN FOR THE CLIENT.

1   WE TRY TO HELP THE CLIENT.  I TRIED TO GUIDE HIM THROUGH,

2   AND HE'S INDICATED HE WANTED TO COOPERATE.  HE HAS BEEN

3   THROUGH SOME DEBRIEFINGS.  THIS MURDER CASE IS NOT SOLVED.

4   I HAVE BEEN CONTACTED BY DETECTIVES OF ROCKY MOUNT ON

5   SEVERAL OCCASIONS AND NOT STATING THAT MR. YORK'S

6   COLLEAGUE GOT THAT WRONG, BUT WE'RE HOPING TO FOLLOW UP ON

7   THAT.  IT'S NOT CONSISTENT WITH -- FOR THAT PART IT'S NOT

8   CONSISTENT WITH MR. NUNEZ BEING INVOLVED IN WHAT YOU

9   DETERMINED TO BE OBSTRUCTION.

10      AS I WORKING ON ONE SIDE TO TRY TO HELP HIM, THEN I

11  KEEP GETTING INFORMATION THAT HE'S SORT OF SHOOTING

12  HIMSELF IN THE FOOT, BUT I WANT TO HELP HIM IF I CAN.  HE

13  IS A YOUNG MAN.  HE'S LOOKING AT AN EXTREME AMOUNT OF

14  TIME, A LITTLE MORE THAN DOUBLE HIS LIFE, IF YOU SENTENCE

15  HIM WITHIN THIS RANGE.  IT WILL BE ANOTHER 26 YEARS BEFORE

16  HE GETS OUT, MORE THAN LIKELY.

17      I WOULD LIKE TO MAYBE SUGGEST THAT MAYBE IT'S HIS

18  LACK OF MATURITY.  HE'S JUST SORT OF LOST.  I DON'T KNOW

19  HOW THIS OCCURRED IN THE LAST FEW MONTHS.  BASICALLY I WAS

20  COMING IN HERE WITH HOPEFULLY A SENTENCE IN THE TEN TO 13

21  YEAR RANGE WITH A POSSIBILITY OF 5K OR RULE 35.  NOW HE'S

22  LOOKING AT ALL OF THIS.

23      I CERTAINLY SUBMIT TO THE COURT THAT ANY SENTENCE IN

24  THE GUIDELINE RANGE AS IT NOW EXISTS, OR EVEN LOW END OF

25  THAT, IS A VERY, VERY SIGNIFICANT SENTENCE.  CERTAINLY

1   HOPING THE COURT WOULD SEE FIT TO SENTENCE WITHIN THE LOW

2   END OF THAT, AND CAN ACHIEVE THE GOALS OF THE SENTENCING

3   FACTORS WITH SOMETHING EVEN LESS, ALTHOUGH I UNDERSTAND

4   THE COURT'S POSITION.

5           **THE COURT:**  THANK YOU, MR. ASHTON.  AT THIS TIME

6   THE COURT WILL RECOGNIZE MR. NUNEZ IF YOU'D LIKE TO MAKE A

7   STATEMENT, SIR.

8           **MR. NUNEZ:**  YOUR EXCELLENCY, OBVIOUSLY I'M

9   NOT -- I'M A SCREW-UP, AND THAT'S MY FAULT.  I DON'T BLAME

10  ANYBODY IN THIS COURTROOM.  THEY ARE DOING THEIR JOB.  I

11  CAN'T BLAME THEM FOR IT.  THERE'S NOTHING THAT I CAN SAY

12  TO POSSIBLY HELP ME.  ALL I KNOW IS I JUST NEED TO MAN UP

13  NOW AND TAKE RESPONSIBILITY.  I'D BE LYING TO YOU IF I

14  TRIED TO CONVINCE YOU OTHERWISE.

15      YOU KNOW, I DID MISS A LOT OF MY CHILDHOOD WITH WHAT

16  HAPPENED TO MY FATHER.  HE WAS A BIG ASSET IN MY FAMILY,

17  AND HE WAS MY HERO.  IRONICALLY, GROWING UP I WANTED TO BE

18  A DEA AGENT.  OBVIOUSLY I WENT THE OTHER WAY.

19      ALL I ASK IS HOPEFULLY -- NOT THAT I ASK, I HOPE I

20  LEARN SOMETHING FROM THIS SO HOPEFULLY IF I MAKE IT OUT OF

21  PRISON, I CAN BE A PRODUCTIVE CITIZEN.  MAYBE LEARN A

22  TRADE, HELP OTHERS THROUGH MY SCREW-UPS IN LIFE.  OTHER

23  THAN THAT, YOUR HONOR, I'M JUST VERY SORRY.  I'M A SORRY

24  PERSON.

25          **THE COURT:**  THANK YOU, MR. NUNEZ.  THE COURT

1  WILL RECOGNIZE MR. ONTJES TO SPEAK ON BEHALF OF THE UNITED

2  STATES.

3          **MR. ONTJES:**  YOUR HONOR, THE UNITED STATES WILL

4  BE BRIEF.  WE WOULD ASK THE COURT TO IMPOSE A SENTENCE IN

5  THE UPPER END OF THE RANGE IN THIS CASE.  WHILE

6  ACKNOWLEDGING THAT THE OBSTRUCTION AND LOSS OF ACCEPTANCE

7  HAS BEEN INCORPORATED WITHIN THAT RANGE, AS THE COURT HAS

8  ALREADY REVIEWED THE FACTS, THIS IS, I SUBMIT, VERY

9  SERIOUS, AS FAR AS OBSTRUCTION GOES, WITH THE DETAILS THAT

10  WERE PROVIDED AND THE INFORMATION PROVIDED TO MR. ALLEN

11  REQUESTING THE MURDER OF THREE DIFFERENT WITNESSES IN THIS

12  CASE.

13          YOUR HONOR, UNDER 3553(A), I KNOW THE COURT IS VERY

14  FAMILIAR WITH THAT STATUTE, AS FAR AS THE PURPOSE OF THE

15  SENTENCING FACTORS, TO PROMOTE RESPECT FOR THE LAW AND

16  REFLECT THE SERIOUSNESS OF THE OFFENSE.  HERE'S A

17  DEFENDANT WHO HAS DISTRIBUTED LARGE AMOUNTS OF DRUGS.  NOT

18  ONLY THAT, BUT WHEN CAUGHT, ATTEMPTED TO HAVE WITNESSES

19  AGAINST HIM KILLED.  FURTHERMORE, TO CONTINUE HIS

20  OPERATIONS EVEN AFTER BEING CAUGHT.  AGAIN, CLEARLY

21  DEMONSTRATES SOMEONE WHO NEEDS OR HAS NOT SHOWN RESPECT

22  FOR THE LAW, AND ACCORDINGLY THE GUIDELINE RANGE, WE

23  BELIEVE, IS APPROPRIATE HERE AND I WOULD ASK THE COURT TO

24  SO SENTENCE.  THANK YOU.

25          **THE COURT:**  THANK YOU.

1    **MR. ASHTON:** YOUR HONOR, IF I MAY INTERRUPT ONE

2  SECOND. WE WANT TO MAKE SURE THE JUDGMENT HAS SUBSTANCE

3  ABUSE TREATMENT WHEREVER HE GOES AND EDUCATION AND

4  VOCATIONAL OPPORTUNITIES AS WELL. I DON'T WANT TO RELY ON

5  HIM BEING FROM SOMEWHERE ELSE, THE DESIGNATION APPROPRIATE

6  HERE NEAREST TO BUTNER.

7    **THE COURT:** SOME FACILITY NEAR --

8    **MR. ASHTON:** HE'S TOLD ME IN THE PAST HE WOULD

9  AT LEAST APPRECIATE A RECOMMENDATION TO BUTNER. IT'S IN

10 THE AREA HE HAS BEEN LIVING THE LAST YEAR OR TWO. THE BOP

11 WILL DO WHAT THEY DECIDE TO DO ANYWAY.

12    **THE COURT:** I CAN'T FATHOM THAT MR. NUNEZ WILL

13 GO TO A MEDIUM SECURITY FACILITY. I JUST CAN'T FATHOM

14 THAT. I CAN'T RECOMMEND THAT. THAT'S ALL THEY HAVE AT

15 BUTNER. IF THERE'S SOME OTHER PLACE YOU WANT TO -- SOME

16 OTHER STATE, I'LL RECOMMEND A STATE, BUT I WON'T RECOMMEND

17 BUTNER.

18    **MR. ASHTON:** HE ASKS IF YOU COULD RECOMMEND

19 CALIFORNIA. AT LEAST THAT WOULD BE CLOSE TO HIS FAMILY,

20 AS WELL AS THE EDUCATIONAL AND SUBSTANCE ABUSE. THANK

21 YOU, YOUR HONOR.

22    **THE COURT:** THANK YOU.

23    (PAUSE IN THE PROCEEDINGS.)

24    ALL RIGHT, MR. NUNEZ. THE COURT RECOGNIZES ITS

25 OBLIGATION TO IMPOSE A SENTENCE SUFFICIENT BUT NOT GREATER

1  THAN NECESSARY TO COMPLY WITH THE PURPOSES SET FORTH IN

2  THE STATUTE.  THE COURT HAS CONSIDERED ALL ARGUMENTS THAT

3  YOUR LAWYER HAS MADE ON YOUR BEHALF.  THE COURT HAS

4  CONSIDERED YOUR STATEMENT, THE INFORMATION SUBMITTED BY

5  YOUR LAWYER, INCLUDING ALL THE LETTERS FROM PEOPLE WHO

6  HAVE WRITTEN ON YOUR BEHALF.  THE ARGUMENTS OF THE

7  ASSISTANT UNITED STATES ATTORNEY.  ALL OF THE RELEVANT

8  EVIDENCE SUBMITTED HERE TODAY IN CONNECTION WITH THE

9  OBJECTIONS.  THE COURT HAS CONSIDERED THE ADVISORY

10 GUIDELINE RANGE.

11     AMONG OTHER THINGS THE COURT IS TO CONSIDER ARE THE

12 NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY

13 AND CHARACTERISTICS OF THE DEFENDANT.  THE NEED FOR THE

14 SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE

15 OFFENSE.  TO PROMOTE RESPECT FOR THE LAW AND PROVIDE JUST

16 PUNISHMENT FOR THE OFFENSE.  TO AFFORD ADEQUATE DETERRENCE

17 TO CRIMINAL CONDUCT.  TO PROTECT THE PUBLIC FROM FURTHER

18 CRIME BY YOU, AND TO PROVIDE YOU WITH NEEDED EDUCATIONAL

19 OR VOCATIONAL TRAINING, MENTAL CARE OR OTHER CORRECTIONAL

20 TREATMENT IN THE MOST EFFECTIVE MANNER.  THE STATUTE LISTS

21 A NUMBER OF OTHER FACTORS.  I HAVE CONSIDERED ALL OF THOSE

22 FACTORS, ALTHOUGH I WILL NOT MENTION THEM.

23     AS FOR THE NATURE AND CIRCUMSTANCES OF THE OFFENSE,

24 YOU DID ENTER A PLEA OF GUILTY TO POSSESSION WITH INTENT

25 TO DISTRIBUTE IN EXCESS OF 100 KILOGRAMS OF MARIJUANA, IN

1  VIOLATION OF 21 USC SECTION 841(A)(1).  THE OFFENSE

2  CONDUCT IS SET FORTH IN THE CRIMINAL INFORMATION AND IN

3  THE PRESENTENCE REPORT.

4      YOU WERE PART OF THE GROUP THAT WERE FOUND -- THAT

5  WAS FOUND WITH APPROXIMATELY 408 KILOGRAMS OF MARIJUANA, I

6  THINK IT WAS 901 POUNDS.  AS REFLECTED IN PARAGRAPH SIX OF

7  THE PSR, THIS WAS NOT YOUR FIRST FORAY INTO THE DRUG

8  BUSINESS.  YOU HAD COME TO NORTH CAROLINA BEFORE TO

9  COORDINATE DRUG SHIPMENTS AND COLLECT MONEY FOR THE PEREZ

10  DRUG ORGANIZATION FROM CALIFORNIA.  YOU ARE CONSERVATIVELY

11  RESPONSIBLE FOR THE DISTRIBUTION OF OVER 3,000 KILOGRAMS

12  OF MARIJUANA, IN THIS COURT'S VIEW.

13      AS PART OF THE NATURE AND CIRCUMSTANCES OF THE

14  OFFENSE, AS REFLECTED IN PARAGRAPH SEVEN OF THE REPORT AND

15  AS FOUND BY THIS COURT, YOU ENGAGED IN OBSTRUCTION OF

16  JUSTICE IN CONNECTION WITH YOUR OFFER TO HAVE DAVID JONES,

17  PHILLIP MORGAN, AND JIMMY BROGDEN MURDERED.  THE COURT

18  FOUND THAT EVIDENCE TO BE QUITE CHILLING.

19      YOU DID NOT DEMONSTRATE ACCEPTANCE OF RESPONSIBILITY

20  IN THIS COURT'S VIEW, BASED ON THAT BEHAVIOR AND CERTAINLY

21  BASED ON YOUR CONVERSATION WITH ALLEN ABOUT TRYING TO HAVE

22  HIM USE HIS FAMILY MEMBER AND HIS TRUCKING BUSINESS TO

23  CONTINUE SHIPMENTS OF ILLEGAL DRUGS INTO THIS STATE.

24      AS FOR YOUR HISTORY AND CHARACTERISTICS, THE COURT

25  DOES NOTE THE INFORMATION IN THE LETTERS THAT MR. ASHTON

RECEIVED AND SUBMITTED ON YOUR BEHALF. YOU DO HAVE SOME
FAMILY MEMBERS WHO CONTINUE TO SUPPORT YOU. THE COURT
RECOGNIZES THAT YOUR FATHER DIED OF LUNG CANCER IN 1997.
YOUR MOTHER IS STILL ALIVE.

YOUR CRIMINAL HISTORY IS NOT GOOD. YOU HAVE A FELONY
TERRORIST THREATS CONVICTION AT AGE 19. YOU HAVE A NUMBER
OF PROBATION REVOCATIONS. YOU ABSCONDED, AS REFLECTED IN
PARAGRAPH 14. YOU HAVE A FELONY POSSESSION OF A FIREARM.
YOU SERVED SOME TIME, GOT OUT, AND ALMOST IMMEDIATELY GOT
BACK INTO THE CRIME BUSINESS.

YOU HAVE A SUBSTANTIAL SUBSTANCE ABUSE HISTORY. THE
COURT IS GOING TO RECOMMEND, AND YOU WILL HAVE A SENTENCE
THAT WILL PROVIDE AMPLE TIME FOR INTENSIVE SUBSTANCE ABUSE
TREATMENT. THE COURT WILL RECOMMEND THAT YOU RECEIVE THE
MOST INTENSIVE SUBSTANCE ABUSE TREATMENT AVAILABLE IN THE
BUREAU OF PRISONS. THE COURT HOPES YOU TAKE ADVANTAGE OF
THE EDUCATIONAL AND VOCATIONAL OPPORTUNITIES THAT WILL BE
MADE AVAILABLE TO YOU.

YOU ARE AN ARTICULATE MAN. YOU ARE A TENTH GRADE
DROP-OUT WHO'S NEVER GOTTEN A GED. AS REFLECTED IN
PARAGRAPHS 30 AND 31 IN THE REPORT, YOU ESSENTIALLY NEVER
HELD A LAWFUL JOB. YOU WORKED BRIEFLY, ACCORDING TO THE
REPORT, AT ECNO LUBE AND TUBE IN ONTARIO, CALIFORNIA, AND
FOR ONE WEEK IN 2004. AT ALL OTHER TIMES YOU HAVE BEEN
UNEMPLOYED, INCARCERATED, OR YOU SUPPORTED YOURSELF

1   THROUGH ILLEGAL MEANS.

2       AS FOR THE NEED FOR THE SENTENCE IMPOSED TO REFLECT

3   THE SERIOUSNESS OF THE OFFENSE, THE COURT WILL IMPOSE A

4   SENTENCE THAT REFLECTS THE SERIOUSNESS OF THIS OFFENSE,

5   INCLUDING YOUR CONDUCT WHILE INCARCERATED HERE.  IT WILL

6   BE A SENTENCE THAT PROMOTES RESPECT FOR THE LAW AND

7   PROVIDES JUST PUNISHMENT.

8       THE COURT BELIEVES IT CRITICAL TO DETER BOTH THE

9   CONDUCT SET FORTH IN THE CRIMINAL INFORMATION AND THE

10  CONDUCT THAT YOU ENGAGED IN WHILE IN JAIL.  THAT TYPE OF

11  CONDUCT NEEDS TO BE DETERRED AND STRIKES AT THE CORE OF

12  THE RULE OF LAW IN THIS COUNTRY.  THERE IS A NEED TO

13  PROTECT THE PUBLIC FROM FURTHER CRIME BY YOU UNTIL YOU

14  DECIDE TO ABIDE BY THE LAW.  THE COURT BELIEVES THAT YOU

15  NEED A LONG TIME TO DO THAT, AND YOU NEED A LONG TIME TO

16  BE PUNISHED FOR YOUR CONDUCT.  TODAY YOU ARE GOING TO GET

17  A SENTENCE THAT WILL PROTECT THE PUBLIC FROM YOU.  YOU DO

18  NEED TO BE INCAPACITATED.

19      AFTER MUCH REFLECTION, THE COURT IS NOT GOING TO VARY

20  UPWARDLY.  I LISTENED TO MR. ASHTON'S ARGUMENT ABOUT

21  VARYING DOWN.  THE COURT, IN LIGHT OF MR. NUNEZ'S OFFENSE

22  BEHAVIOR, HISTORY AND CHARACTERISTICS, THE NEED TO DETER

23  HIM, THE NEED TO DETER OTHERS, BELIEVES A DOWNWARD

24  VARIANCE WOULD BE GROSSLY INAPPROPRIATE IN THIS CASE, AN

25  UPWARD VARIANCE WOULD BE VERY DEFENSIBLE.

1    THERE ARE CASES, AND THE COURT HAS REVIEWED THEM,

2    INCLUDING *UNITED STATES V. WATERS*, 281 F.APPX 152, (4TH

3    CIRCUIT, 2008), WHICH AFFIRMED AN UPWARD VARIANCE WHERE

4    THERE WAS ANALOGOUS OBSTRUCTIVE BEHAVIOR.  I WILL NOT

5    UPWARDLY VARY TODAY, AFTER HAVING FULLY CONSIDERED ALL OF

6    THE FACTORS IN 3553(A).

7    THE COURT WILL RECOMMEND AND HOPES THAT MR. NUNEZ

8    TAKES ADVANTAGE OF THE VOCATIONAL AND EDUCATIONAL

9    OPPORTUNITIES.  THE COURT DOES RECOMMEND SUBSTANCE ABUSE

10   TREATMENT.  THE COURT RECOMMENDS THAT MR. NUNEZ SERVE HIS

11   PRISON SENTENCE AT A FEDERAL CORRECTIONAL INSTITUTION ON

12   THE WEST COAST THAT IS OF A SUFFICIENT DEGREE OF SECURITY

13   TO HOUSING.

14   HAVING FULLY CONSIDERED ALL OF THE FACTORS SET OUT IN

15   3553(A) AND ALL ARGUMENTS OF COUNSEL, PURSUANT TO THE

16   SENTENCING REFORM ACT OF 1984, AND IN ACCORDANCE WITH THE

17   SUPREME COURT'S DECISION IN *UNITED STATES V. BOOKER* AND

18   ITS PROGENY, IT IS THE JUDGMENT OF THE COURT THAT THE

19   DEFENDANT, FERNANDO MIGUEL NUNEZ, IS HEREBY COMMITTED TO

20   THE CUSTODY OF THE BUREAU OF PRISONS TO BE IMPRISONED FOR

21   A TERM OF 365-MONTHS.

22   UPON RELEASE FROM IMPRISONMENT, THE DEFENDANT SHALL

23   BE PLACED ON SUPERVISED RELEASE FOR A TERM OF FIVE YEARS.

24   WITHIN 72 HOURS OF RELEASE FROM THE CUSTODY OF THE BUREAU

25   OF PRISONS, THE DEFENDANT SHALL REPORT IN PERSON TO THE

1   PROBATION OFFICE IN THE DISTRICT TO WHICH HE'S RELEASED.

2        WHILE ON SUPERVISED RELEASE, THE DEFENDANT SHALL NOT

3   COMMIT ANOTHER FEDERAL, STATE, OR LOCAL CRIME AND SHALL

4   NOT ILLEGALLY POSSESS A CONTROLLED SUBSTANCE.  HE SHALL

5   NOT POSSESS A FIREARM OR DESTRUCTIVE DEVICE.  HE SHALL

6   COMPLY WITH THE STANDARD CONDITIONS THAT HAVE BEEN ADOPTED

7   AND SHALL COMPLY WITH THE FOLLOWING ADDITIONAL CONDITIONS.

8        HE SHALL PARTICIPATE AS DIRECTED BY PROBATION IN THE

9   TREATMENT FOR NARCOTIC ADDICTION.  HE SHALL CONSENT TO

10  WARRANTLESS SEARCH AS DIRECTED BY PROBATION UNDER THE

11  STANDARD CONDITIONS OF THIS DISTRICT.  HE SHALL

12  PARTICIPATE IN A VOCATIONAL TRAINING PROGRAM.  HE SHALL

13  COOPERATE IN THE COLLECTION OF DNA.  HE SHALL PAY A

14  SPECIAL ASSESSMENT OF $100 TO THE UNITED STATES, WHICH

15  SHALL BE DUE IMMEDIATELY.

16       THE COURT IS GOING TO IMPOSE A FINE OF $10,000.  THE

17  COURT IS NOT GOING TO IMPOSE INTEREST.  THAT FINE WILL BE

18  PAID THROUGH THE INMATE FINANCIAL RESPONSIBILITY PROGRAM.

19       MR. NUNEZ WILL HAVE A JOB WHILE INCARCERATED.  PART

20  OF HIS PAY FROM THAT JOB WILL GO TO PAY HIS FINE.  ANY

21  AMOUNT DUE AT THE TIME OF RELEASE SHALL BE PAID IN

22  INSTALLMENTS OF $50 PER MONTH.

23       THE COURT HAS ANNOUNCED THIS SENTENCE HAVING FULLY

24  CONSIDERED ALL THE 3553(A) FACTORS, ALL ARGUMENTS OF

25  COUNSEL, ALL EVIDENCE IN THE RECORD THAT WAS ADMITTED.

1     MR. NUNEZ, YOU CAN APPEAL YOUR CONVICTION IF YOU

2     BELIEVE THAT YOUR GUILTY PLEA WAS SOMEHOW UNLAWFUL OR

3     INVOLUNTARY, OR IF THERE WAS SOME OTHER FUNDAMENTAL DEFECT

4     IN THE PROCEEDING THAT WAS NOT WAIVED BY YOUR GUILTY PLEA.

5     YOU ALSO HAVE A STATUTORY RIGHT TO APPEAL YOUR SENTENCE

6     UNDER CERTAIN CIRCUMSTANCES, PARTICULARLY IF YOU THINK

7     YOUR SENTENCE IS CONTRARY TO LAW.  HOWEVER, THE DEFENDANT

8     MAY WAIVE THOSE RIGHTS AS PART OF THE PLEA AGREEMENT.  YOU

9     DID ENTER INTO A PLEA AGREEMENT.

10    IN PARAGRAPH 2C OF THAT AGREEMENT, WHICH THE COURT

11    READ TO YOU AT YOUR RULE 11 HEARING, YOU AGREED TO WAIVE

12    CERTAIN APPELLATE RIGHTS.  IN LIGHT OF THE SENTENCE THAT

13    YOU RECEIVED, IT'S THE COURT'S VIEW THAT YOU WAIVED YOUR

14    RIGHT TO APPEAL YOUR SENTENCE.  IF YOU BELIEVE THAT WAIVER

15    IN YOUR PLEA AGREEMENT IN PARAGRAPH 2C IS EITHER

16    UNENFORCEABLE OR INAPPLICABLE FOR ANY REASON, YOU CAN

17    PRESENT THAT THEORY TO THE APPELLATE COURT.  WITH FEW

18    EXCEPTIONS, ANY NOTICE OF APPEAL MUST BE FILED WITHIN TEN

19    DAYS OF THE JUDGMENT BEING ENTERED ON THE DOCKET IN YOUR

20    CASE.

21    IF YOU ARE UNABLE TO PAY THE COST OF AN APPEAL, YOU

22    MAY APPLY FOR LEAVE TO APPEAL IN FORMA PAUPERIS.  IF YOU

23    SO REQUEST, THE CLERK OF COURT WILL PREPARE AND FILE A

24    NOTICE OF APPEAL ON YOUR BEHALF.

25    MR. ASHTON, I THINK I GOT ALL THE RECOMMENDATIONS YOU

1    ASKED FOR.  IS THERE ANYTHING ELSE, SIR?

2              **MR. ASHTON:**  NO, YOUR HONOR.  THEY'RE ALL IN

3    THERE.  THANK YOU.

4              **THE COURT:**  ANYTHING ELSE FROM THE GOVERNMENT?

5              **MR. ONTJES:**  NO, YOUR HONOR.

6              **THE COURT:**  THAT WILL CONCLUDE THE MATTER

7    INVOLVING MR. NUNEZ.  GOOD LUCK TO YOU, SIR.

8

9

10

11

12

13

14

15

16

17

18

19

20                        END OF TRANSCRIPT

21

22

23

24

25

1                         CERTIFICATE

2        THIS IS TO CERTIFY THAT THE FOREGOING TRANSCRIPT OF

3   PROCEEDINGS TAKEN AT THE CRIMINAL SESSION OF UNITED STATES

4   DISTRICT COURT IS A TRUE AND ACCURATE TRANSCRIPTION OF THE

5   PROCEEDINGS TAKEN BY ME IN MACHINE SHORTHAND AND

6   TRANSCRIBED BY COMPUTER UNDER MY SUPERVISION.

7        THIS THE 19TH DAY OF AUGUST, 2009.

8

9                         /S/ DONNA J. TOMAWSKI

10                        DONNA J. TOMAWSKI
                          OFFICIAL COURT REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25